**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| AILEEN GARCES, EDELIN ALTUVE, JENNY ANDERSON, CARRIE ASHBOURNE, ASHLEE CAMPION, JESSICA CONNER, BRANDY DANIELS, APRIL GILLENS, JANDREA GLENN, ELIZABETH HALL, AMBER HOGAN, LASZLO KOVACS, CORI LAU, MICHELLE LYLES, SHALAYA MARTIN, CHRISTINA MARTINSON, MELISSA MEJIA, CHEY'NA MICCICHE, JULIA MILTON, ASHLEY MORGAN, MICHAEL MORROW, STACY MUSTO, CHRIS NALLEY, GLADYS OKOLO, QUEEN POUGH, CORTNEY POWELL, AMY PRONDZINSKI, JESSICA REED, SORAYA SANTOS, KIRA SPURGEON, LINDSEY TARLTON, LIDIA TILAHUN, JULIA VICE, DAMEN WALTON, JENNIFER WEISS, and JANICE WILSON, individually, and on behalf of all others similarly situated, | **Case No.:** <br><br> **Jury Trial Demanded** |
| Plaintiffs, | |
| v. | |
| GERBER PRODUCTS CO., | |
| Defendant. | |

# <u>CLASS ACTION COMPLAINT</u>

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

PARTIES ....................................................................................................................................2

JURISDICTION AND VENUE ..................................................................................................5

FACTUAL ALLEGATIONS ......................................................................................................6

    The Subcommittee Report..................................................................................................6

    Arsenic in Defendant's Baby Food ...................................................................................7

    Lead in Defendant's Baby Food........................................................................................8

    Cadmium in Defendant's Baby Food...............................................................................10

    Defendant's Baby Food....................................................................................................10

    Consumer Expectations Regarding Baby Food.................................................................13

    Plaintiff Edelin Altuve Purchased Defendant's Contaminated Baby Food ..........................15

    Plaintiff Jenny Anderson Purchased Defendant's Contaminated Baby Food......................16

    Plaintiff Carrie Ashbourne Purchased Defendant's Contaminated Baby Food ...................16

    Plaintiff Ashlee Campion Purchased Defendant's Contaminated Baby Food .....................16

    Plaintiff Jessica Conner Purchased Defendant's Contaminated Baby Food.......................17

    Plaintiff Brandy Daniels Purchased Defendant's Contaminated Baby Food.......................17

    Plaintiff Aileen Garces Purchased Defendant's Contaminated Baby Food.........................17

    Plaintiff April Gillens Purchased Defendant's Contaminated Baby Food...........................18

    Plaintiff Jandrea Glenn Purchased Defendant's Contaminated Baby Food........................18

    Plaintiff Elizabeth Hall Purchased Defendant's Contaminated Baby Food.........................18

    Plaintiff Amber Hogan Purchased Defendant's Contaminated Baby Food.........................19

    Plaintiff Laszlo Kovacs Purchased Defendant's Contaminated Baby Food........................19

Plaintiff Cori Lau Purchased Defendant's Contaminated Baby Food ...................................19

Plaintiff Michelle Lyles Purchased Defendant's Contaminated Baby Food..........................20

Plaintiff Shalaya Martin Purchased Defendant's Contaminated Baby Food .........................20

Plaintiff Christina Martinson Purchased Defendant's Contaminated Baby Food.................20

Plaintiff Melissa Mejia Purchased Defendant's Contaminated Baby Food ...........................21

Plaintiff Chey'na Micciche Purchased Defendant's Contaminated Baby Food ...................21

Plaintiff Julia Milton Purchased Defendant's Contaminated Baby Food .............................21

Plaintiff Ashley Morgan Purchased Defendant's Contaminated Baby Food.........................22

Plaintiff Michael Morrow Purchased Defendant's Contaminated Baby Food......................22

Plaintiff Stacy Musto Purchased Defendant's Contaminated Baby Food..............................22

Plaintiff Chris Nalley Purchased Defendant's Contaminated Baby Food .............................23

Plaintiff Gladys Okolo Purchased Defendant's Contaminated Baby Food ...........................23

Plaintiff Queen Pough Purchased Defendant's Contaminated Baby Food ...........................23

Plaintiff Cortney Powell Purchased Defendant's Contaminated Baby Food.........................23

Plaintiff Amy Prondzinski Purchased Defendant's Contaminated Baby Food......................24

Plaintiff Jessica Reed Purchased Defendant's Contaminated Baby Food .............................24

Plaintiff Soraya Santos Purchased Defendant's Contaminated Baby Food ..........................25

Plaintiff Kira Spurgeon Purchased Defendant's Contaminated Baby Food ..........................25

Plaintiff Lindsay Tarlton Purchased Defendant's Contaminated Baby Food .......................25

Plaintiff Lidia Tilahun Purchased Defendant's Contaminated Baby Food...........................26

Plaintiff Julia Vice Purchased Defendant's Contaminated Baby Food..................................26

Plaintiff Damen Walton Purchased Defendant's Contaminated Baby Food .........................26

Plaintiff Jennifer Weiss Purchased Defendant's Contaminated Baby Food ..........................26

Plaintiff Janice Wilson Purchased Defendant's Contaminated Baby Food ..........................27

Facts Relating to All Plaintiffs and Class Members..............................................27

CLASS ALLEGATIONS ....................................................................................30

COUNT I (On Behalf of Plaintiffs Hogan, Reed, and the Alaska Subclass)
Violation of Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. §
45.50.471, *et seq.* .............................................................................................37

COUNT 2 (On Behalf of Plaintiff Morgan and the Arizona Subclass) Violation of Arizona
Deceptive Trade Practices Act, Ariz. Stat. § 44-1521, *et seq* .........................................40

COUNT 3 (On Behalf of Plaintiffs Micciche, Morrow, Tilahun, and the California Subclass)
Violation of California Business & Professions Code §§ 17200, *et seq*. for Engaging in
Unlawful, Unfair, and Deceptive Business Acts or Practices..........................................42

COUNT 4 (On Behalf of Plaintiffs Micciche, Morrow, Tilahun, and the California Subclass)
Violation of California Consumer Legal Remedies Act, Cal. Civ. Code § 1770, *et seq*..............45

COUNT 5 (On Behalf of Plaintiff Glenn and the Colorado Subclass) Violation of Colorado
Consumer Protection Act ("CCPA"), Colo. Rev. Stat. §§6-1-101, *et seq*....................................48

COUNT 6 (On Behalf of Plaintiffs Altuve, Hogan, and the Florida Subclass) Violation of the
Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") Fla. Stat. § 501.201, *et seq*......50

COUNT 7 (On Behalf of Plaintiff Martinson and the Georgia Subclass) Violation of Georgia
Uniform Deceptive Trade Practices Act ("GUDTPA") O.C.G.A. §§ 10-1-370, *et seq* ...............53

COUNT 8 (On Behalf of Plaintiff Martinson and the Georgia Subclass)
Violation of Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*. .....................56

COUNT 9 (On Behalf of Plaintiff Garces and the Illinois Subclass) Violation of the Illinois
Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq* ........58

COUNT 10 (On Behalf of Plaintiff Tarlton and the Indiana Subclass) Violation of the Indiana
Deceptive Trade Practices Act, Ind. Code § 24-5-0.5, *et seq*. ......................................60

COUNT 11 (On Behalf of Plaintiffs Spurgeon, Walton, and the Iowa Subclass) Violation of
the Iowa Private Right of Action for Consumer Frauds Act, Iowa Code §§ 714H.1, *et seq*.
("IPRACFA") .................................................................................................63

COUNT 12 (On Behalf of Plaintiff Lyles and the Maryland Subclass) Violation of the Maryland
Consumer Protection Act, Md. Code, Comm. Law §§ 13-301, *et seq*. ("MCPA").....................65

COUNT 13 (On Behalf of Plaintiff Santos and the Massachusetts Subclass) Violation of the Massachusetts Regulation of Business Practices for Consumers Protection Act, M.G.L.A. c. 93A, *et seq*. ....................................................................................................................................68

COUNT 14 (On Behalf of Plaintiff Milton and the Michigan Subclass) Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901 ("MCPA"), *et seq*. ..............70

COUNT 15 (On Behalf of Plaintiffs Musto, Nalley, and the Missouri Subclass) Violation of the Missouri Merchandising Practices Act ("MMPA"), Mo. Stat. § 407.010, *et seq* ....................................................................................................................................73

COUNT 16 (On Behalf of Plaintiff Powell and the Montana Subclass) Violation of Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code § 30-14-101, *et seq* .............76

COUNT 17 (On Behalf of Plaintiffs Lau, Morrow, and the Nevada Subclass) Violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0915 ("NDTPA").................78

COUNT 18 (On Behalf of Plaintiff Hall and the New Hampshire Subclass) Violation of New Hampshire Regulation of Business Practices for Consumer Protection, N.H. Rev. Stat. §§ 358-A:1, *et seq*....................................................................................................................80

COUNT 19 (On Behalf of Plaintiff Ashbourne and the New Jersey Subclass) Violation of the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. § 56:8, *et seq* ................................83

COUNT 20 (On Behalf of Plaintiff Martin and the New York Subclass) (Against Defendant Gerber) Violation of New York Deceptive Trade Practices Act, N.Y. Gen. Bus. Law § 349 ......85

COUNT 21 (On Behalf of Plaintiff Martin and the New York Subclass) Violation of New York False Advertising Law, N.Y. Gen. Bus. Law § 350 ............................................................87

COUNT 22 (On Behalf of Plaintiffs Daniels, Mejia, Pough, and the North Carolina Subclass) Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq*. ("NCUDTPA").............................................................................................89

COUNT 23 (On Behalf of Plaintiff Altuve and the North Dakota Subclass) Violation of the North Dakota Unlawful Sales or Advertising Practices, N.D.C.C. § 51-15, *et seq*. .....................91

COUNT 24 (On Behalf of Plaintiff Vice and the Ohio Subclass) Violation of Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345, *et seq*. ("OCSPA").................................................94

COUNT 25 (On Behalf of Plaintiff Weiss and the Pennsylvania Subclass) Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1, *et seq*. ("PUTPCPL") ................................................................................................................................97

COUNT 26 (On Behalf of Plaintiff Kovacs and the Tennessee Subclass) Violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Stat. § 47-18-101, *et seq*. ....................100

COUNT 27 (On Behalf of Plaintiffs Campion, Wilson, and the Texas Subclass) Violation of the Texas Deceptive Trade Practices-Consumer Protection Act, V.T.C.A., Bus. & Comm. Code § 17.41, *et seq.* ..................................................................................102

COUNT 28 (On Behalf of Plaintiff Okolo and the Virginia Subclass) Violation of the Virginia Consumer Protection Act of 1977 ("VCPA"), Va. Code § 59.1-196, *et seq.* ...............105

COUNT 29 (On Behalf of Plaintiff Anderson and the Washington Subclass) Violation of the Washington Consumer Protect Act ("WCPA"), RCWA § 19.86.010, *et seq* .......................108

COUNT 30 (On Behalf of Plaintiff Gillens and the Washington D.C. Subclass) Violation of Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq*. ("CPPA") .......................110

COUNT 31 (On Behalf of Plaintiff Conner and the West Virginia Subclass) Violation of West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-6-101, *et seq.* ("WVCPPA") ................................................................................113

COUNT 32 (On Behalf of Plaintiff Prondzinski and the Wisconsin Subclass) Violation of Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.183 .................................................115

COUNT 33 (On Behalf of All Plaintiffs and the Class and Each State Subclass) Fraudulent Concealment ..........................................................................................118

COUNT 34 (On Behalf of All Plaintiffs and the Class and Each State Subclass) Unjust Enrichment ................................................................................................119

PRAYER FOR RELIEF  ........................................................................................121

Plaintiffs AILEEN GARCES, EDELIN ALTUVE, JENNY ANDERSON, CARRIE ASHBOURNE, ASHLEE CAMPION, JESSICA CONNER, BRANDY DANIELS, APRIL GILLENS, JANDREA GLENN, ELIZABETH HALL, AMBER HOGAN, LASZLO KOVACS, CORI LAU, MICHELLE LYLES, SHALAYA MARTIN, CHRISTINA MARTINSON, MELISSA MEJIA, CHEY'NA MICCICHE, JULIA MILTON, ASHLEY MORGAN, MICHAEL MORROW, STACY MUSTO, CHRIS NALLEY, GLADYS OKOLO, QUEEN POUGH, CORTNEY POWELL, AMY PRONDZINSKI, JESSICA REED, SORAYA SANTOS, KIRA SPURGEON, LINDSEY TARLTON, LIDIA TILAHUN, JULIA VICE, DAMEN WALTON, JENNIFER WEISS, and JANICE WILSON ("Plaintiffs"), individually, and on behalf of all others similarly situated, by and through counsel at Dann Law and Zimmerman Law Offices, P.C., bring this Class Action Complaint against Defendant GERBER PRODUCTS CO. ("Defendant"), as follows:

## INTRODUCTION

1.      On February 4, 2021, the United States House of Representatives Committee on Oversight and Reform's Subcommittee on Economic and Consumer Policy (the "House Subcommittee") released a report entitled "Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury" (the "Subcommittee Report"). *See generally*, Subcommittee Report, attached hereto as <u>Exhibit 1</u>. According to the Subcommittee Report, which cites test results provided by baby food companies to the Committee, several brands of baby food sold in the United States contain unsafe levels of toxic heavy metals, including those sold by Defendant. *See*, Subcommittee Report, p. 2.

2.      Given the health risks associated with high levels of toxic heavy metals, the mere presence of these substances in baby food is a material fact to consumers. To an even greater

1

extent, the unreasonably high levels of toxic heavy metals found in Defendant's baby food products sell is material. Consumers—such as Plaintiffs and members of the Classes (defined below)—are unwilling to purchase baby food that contains unsafe levels of toxic heavy metals.

3.      Defendant knew about the presence and levels of toxic heavy metals in its baby food. Defendant also knew about the health effects of exposure to toxic heavy metals and the impact they have on developing children and babies. Defendant omitted and concealed these material facts from Plaintiffs and Class members. Defendant furthered their unfair and deceptive course of conduct by making representations about the wholesomeness and health benefits of their baby food.

4.      Accordingly, Plaintiffs bring this suit on behalf of themselves and Classes of similarly situated individuals for out-of-pocket losses, compensation, and all other relief to which they are lawfully entitled, resulting from Defendant's sale of baby food that contained unsafe levels of toxic heavy metals.

## **PARTIES**

5.      Plaintiff AILEEN GARCES ("Garces") is a natural person, and resident and citizen of Illinois.

6.      Plaintiff EDELIN ALTUVE ("Altuve") is a natural person, and resident and citizen of North Dakota.

7.      Plaintiff JENNY ANDERSON ("Anderson") is a natural person, and resident and citizen of Washington.

8.      Plaintiff CARRIE ASHBOURNE ("Ashbourne") is a natural person, and resident and citizen of New Jersey.

9.      Plaintiff ASHLEE CAMPION ("Campion") is a natural person, and resident and citizen of Texas.

10.     Plaintiff JESSICA CONNER ("Connor") is a natural person, and resident and citizen of West Virginia.

11.     Plaintiff BRANDY DANIELS ("Daniels") is a natural person, and resident and citizen of North Carolina.

12.     Plaintiff APRIL GILLENS ("Gillens") is a natural person, and resident and citizen of Washington, D.C.

13.     Plaintiff JANDREA GLENN ("Glenn") is a natural person, and resident and citizen of Colorado.

14.     Plaintiff ELIZABETH HALL ("Hall") is a natural person, and resident and citizen of New Hampshire.

15.     Plaintiff AMBER HOGAN ("Hogan") is a natural person, and resident and citizen of Alaska.

16.     Plaintiff LASZLO KOVACS ("Kovacs") is a natural person, and resident and citizen of Tennessee.

17.     Plaintiff CORI LAU ("Lau") is a natural person, and resident and citizen of Nevada.

18.     Plaintiff MICHELLE LYLES ("Lyles") is a natural person, and resident and citizen of Maryland.

19.     Plaintiff SHALAYA MARTIN ("Martin") is a natural person, and resident and citizen of New York.

20.     Plaintiff CHRISTINA MARTINSON ("Martinson") is a natural person, and resident and citizen of Georgia.

3

21.     Plaintiff MELISSA MEJIA ("Mejia") is a natural person, and resident and citizen of North Carolina.

22.     Plaintiff CHEY'NA MICCICHE ("Micciche") is a natural person, and resident and citizen of California.

23.     Plaintiff JULIA MILTON ("Milton") is a natural person, and resident and citizen of Michigan.

24.     Plaintiff ASHLEY MORGAN ("Morgan") is a natural person, and resident and citizen of Arizona.

25.     Plaintiff MICHAEL MORROW ("Morrow") is a natural person, and resident and citizen of California.

26.     Plaintiff STACY MUSTO ("Musto") is a natural person, and resident and citizen of Missouri.

27.     Plaintiff CHRIS NALLEY ("Nalley") is a natural person, and resident and citizen of Maryland.

28.     Plaintiff GLADYS OKOLO ("Okolo") is a natural person, and resident and citizen of Virginia.

29.     Plaintiff QUEEN POUGH ("Pough") is a natural person, and resident and citizen of North Carolina.

30.     Plaintiff CORTNEY POWELL ("Powell") is a natural person, and resident and citizen of Montana.

31.     Plaintiff AMY PRONDZINSKI ("Prondzinski") is a natural person, and resident and citizen of Wisconsin.

4

32.    Plaintiff JESSICA REED ("Reed") is a natural person, and resident and citizen of Alaska.

33.    Plaintiff SORAYA SANTOS ("Santos") is a natural person, and resident and citizen of Massachusetts.

34.    Plaintiff KIRA SPURGEON ("Spurgeon") is a natural person, and resident and citizen of Iowa.

35.    Plaintiff LINDSEY TARLTON ("Tarlton") is a natural person, and resident and citizen of Indiana.

36.    Plaintiff LIDIA TILAHUN ("Tilahun") is a natural person, and resident and citizen of California.

37.    Plaintiff JULIA VICE ("Vice") is a natural person, and resident and citizen of Ohio.

38.    Plaintiff DAMEN WALTON ("Walton") is a natural person, and resident and citizen of Iowa.

39.    Plaintiff JENNIFER WEISS ("Weiss") is a natural person, and resident and citizen of Pennsylvania.

40.    Plaintiff JANICE WILSON ("Wilson") is a natural person, and resident and citizen of Texas.

41.    Defendant GERBER PRODUCTS CO. is a Michigan corporation with its headquarters in Arlington, Virginia. Gerber sells its baby food under the "Gerber" brand name ("Gerber Brand Baby Food"). Gerber Brand Baby Food is sold nationwide, including throughout the Commonwealth of Virginia.

## JURISDICTION AND VENUE

42.    This Court has original jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. § 1332(d).  As set forth below, the proposed Classes each include more than 100 individuals, and the amount of controversy, in the aggregate, exceeds the sum of $5,000,000 exclusive of interest and costs, given Defendant's market reach and the approximate number of putative Class members in the United States.  Some members of the proposed Classes are citizens of states different from Defendant.

43.     Venue is proper in this district under 28 U.S.C. § 1391, because a substantial part of the events and omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

### *The Subcommittee Report*

44.     Inorganic arsenic, lead, cadmium, and mercury are toxic heavy metals (the "Toxic Heavy Metals"). The United States Food and Drug Administration ("FDA") and the World Health Organization ("WHO") have declared these Toxic Heavy Metals dangerous to human health. Specifically, FDA states that these Toxic Heavy Metals have "no established health benefit," "lead to illness, impairment, and in high doses, death," and because of bioaccumulation, "even low levels of harmful metals from individual food sources, can sometimes add up to a level of concern."[1]

45.     The dangerous effects of these toxins are exacerbated and can be indelible in developing and vulnerable bodies and brains of babies and children, who FDA explains are at the greatest risk of harm. *See* Subcommittee Report, p. 2. Exposure, such as ingestion, of Toxic Heavy Metals by babies and children leads to untreatable and permanent brain damage, resulting in reduced intelligence and behavioral problems. For instance, scientific studies have connected exposure to lead to a substantial decrease in children's total IQ points and their lifetime earning capacity. *See* Subcommittee Report, p. 9.

---

[1] FDA, *Metals and Your Food*, available at: https://www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food.

6

46.     "Exposure to toxic heavy metals [such as arsenic, lead, cadmium, and mercury] causes permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior in children. Toxic heavy metals endanger infant neurological development and long-term brain function." *See*, Subcommittee Report, p. 2.

47.     Because Toxic Heavy Metals have no benefits and severe detriments, Healthy Babies Bright Futures, an alliance of nonprofit organizations, scientists, and donors whose work is cited favorably in the Subcommittee Report, has concluded that baby food should have no measurable amount of arsenic, lead, cadmium, or mercury. [2]

48.     Given the risks, and in response to reports alleging high levels of Toxic Heavy Metals in baby food sold in the United States, the House Subcommittee launched an investigation into the presence of Toxic Heavy Metals in certain brands of baby food, including Defendant's baby food.   *See*, Subcommittee Report, p. 2.   The results of the House Subcommittee's investigation were set forth in the Subcommittee Report, which was released on February 4, 2021.

### Arsenic in Defendant's Baby Food

49.     According to the Subcommittee Report, arsenic was present in all brands of baby food responding to the House Subcommittee's investigation. Gerber Brand Baby Food used high-arsenic ingredients, including rice flour that contained over 90 ppb arsenic.

50.     The levels of toxic arsenic in Defendant's baby food far exceeded the 10 ppb limit the FDA has set for arsenic in bottled water that is legal to sell to any consumer, even full grown adults.  *See*, Subcommittee Report, p. 4.

---

[2] Healthy Babies Bright Futures, *What's in My Baby's Food? A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019), at 12 (online www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf).

51.     Arsenic is the most dangerous of the Toxic Heavy Metals at issue and poses the most significant risk to human health.  *See*, Subcommittee Report, p. 10. Currently known risks of arsenic to health include respiratory, gastrointestinal, haematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children."[3]

52.     One study found negative effects in cognitive development of schoolchildren exposed to concentrations of arsenic over 5 ppb. For the authors of the study, 5 ppb was an important threshold for small children.[4] Consumer reports has recommended setting the limit of arsenic at 3 ppb.

53.     Gerber agreed to provide only limited data to the House Subcommittee. But the data it provided shows that Gerber routinely used ingredients in Gerber Brand Baby Food that contained over 90 ppb arsenic, including 67 batches of rice flour. *See* Subcommittee Report, p. 19.

54.     Gerber used grape juice concentrate in Gerber Brand Baby Food containing 39 ppb inorganic arsenic. This quadruples the FDA draft guidance requiring less than 10 ppb arsenic in apple juice concentrate, a functionally identical ingredient. *See* Subcommittee Report, p. 52.

### *Lead in Defendant's Baby Food*

55.     Lead was also present in Defendant's baby food. Gerber Brand Baby Food also used high-lead ingredients in Gerber Brand Baby Food, including some that contained over 48 ppb lead.  *See*, Subcommittee Report, p. 3.

---

[3] Agency for Toxic Substances and Disease Registry, *ATSDR's Substance Priority List* (2019), available at http://www.atsdr.cdc.gov/spl/index.html#2019spl.
[4] Miguel Rodríguez-Barranco et al., Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioural Disorders in Children: A Systematic Review and Meta-Analysis (June 1, 2013) (online at https://pubmed.ncbi.nlm.nih.gov/23570911/).

56.     For comparison, the FDA has set the maximum level of lead in bottled water at 5 ppb. *See*, Subcommittee Report, p. 4.

57.     Lead is the second most dangerous of the Toxic Heavy Metals discussed in the Subcommittee Report. Because lead can accumulate in the body, even small doses of lead have deleterious effects on children, including health, behavioral, cognitive, and development issues. The FDA states that "[h]igh levels of lead exposure can seriously harm children's health and development, specifically the brain and nervous system."[5] There is a growing consensus that lead levels in baby food should not exceed 1 ppb. Healthy Babies Bright Futures concludes that no measurable amount of lead should be in baby food.

58.     At least two studies have established a significant association between early childhood exposure to lead and decreased standardized test scores, academic achievement, and diseases such as attention-deficit/hyperactivity disorder ("ADHD"). These effects last into adulthood according to other studies.[6]

59.     Gerber agreed to provide limited data to the House Subcommittee. But the data it provided shows that Gerber used ingredients in Gerber Brand Baby Food that tests show contained as much as 48 ppb lead, and Gerber used many ingredients containing over 20 ppb lead, including its juice ingredients and sweet potatoes. *See* Subcommittee Report, p. 27. Gerber's tested juice concentrate measured an average of 11.2 ppb lead, which exceeds the 10 ppb standard for bottled

---

[5] FDA, *Metals and Your Food*, available at: https://www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food.
[6] Nanhua Zhang et al., *Early Childhood Lead Exposure and Academic Achievement: Evidence From Detroit Public Schools*, available at: http://mediad.publicbroadcasting.net/p/michigan/files/201302/AJPH.2012.pdf; Anne Evens *et al.*, *The Impact of Low-Level Lead Toxicity on School Performance Among Children in the Chicago Public Schools: A Population-Based Retrospective Cohort Study*, available at: https://ehjournal.biomedcentral.com/articles/10.1186/s12940-015-0008-9; Maitreyi Mazumdar *et al.*, *Low-Level Environmental Lead Exposure in Childhood and Adult Intellectual Function: A Follow-Up Study*, available at: www.ncbi.nlm.nih.gov/pmc/articles/PMC3072933/.

water set by FDA.

### *Cadmium in Defendant's Baby Food*

60. Cadmium was another Toxic Heavy Metal found to be present in all brands of baby food subject to the House Subcommittee's investigation. *See*, Subcommittee Report, p. 3. Gerber Brand Baby Food was made with ingredients that contained over 87 ppb cadmium. *See*, Subcommittee Report, p. 4.

61. For comparison, the FDA has set the maximum level of cadmium in bottled water at 5 ppb. *See*, Subcommittee Report, p. 4.

62. Cadmium is the seventh most dangerous heavy metal toxin according to the ATSDR. Exposure to cadmium is linked with decreases in IQ and development of ADHD. The EPA and FDA set the limit at 5 ppb of cadmium in drinking water and bottled water. The WHO limits cadmium in drinking water at 3 ppb. Certain experts recommend an upper limit of 1 ppb of cadmium in fruit juices.

63. Gerber used carrots in Gerber Brand Baby Food, 75% of which contained between 5 and 87 ppb cadmium. *See* Subcommittee Report, p. 4.

### *Defendant's Baby Food*

64. Defendant manufactures, distributes, advertises, markets, and sells brands of baby food evaluated in the Subcommittee Report. Gerber manufactures, distributes, advertises, markets, and sells Gerber Brand Baby Food.

65. Defendant directs, controls, and participates in the manufacturing and packaging of the baby food products that it sells. As part of that direction, control, and participation, Defendant determines and is responsible for the ingredients used in its baby food.

66.     Defendant knows and is responsible for the ingredients in the baby food products that it sells.

67.     Defendant created, developed, reviewed, authorized, and is responsible for the textual and graphic content on the packaging of the baby food products that it sells.  This is supported by the fact that the labels on Gerber Brand Baby Food contain Gerber's corporate logo and trademark, and note that Gerber Brand Baby Food is distributed by Gerber.

68.     Each package of Gerber Brand Baby Food contains standardized labeling created, developed, reviewed, and authorized by Gerber. The packaging of all types of Gerber Brand Baby Food is the same or substantially similar.

69.     Defendant knew, created, developed, reviewed and is responsible for the representations contained on each package of baby food that it sells.

70.     The labels on some of the varieties of Gerber Brand Baby Food—including some of those that Plaintiffs and Class members purchased—state that the product contains "iron to help support learning ability."

71.     The labels on many varieties of Gerber Brand Baby Food—including some of those that Plaintiffs and Class members purchased—tout those products as being free of GMO—which stands for "genetically modified organism"—ingredients. Like BPA, GMOs are also believed to be associated with health risks, "including infertility, immune problems, accelerated aging, faulty insulin regulation and changes in major organs and the gastrointestinal system."[7]  As such, these varieties of Gerber Brand Baby Food are marketed as *lacking* a dangerous substance that can negatively affect consumers of the product.

---

[7] CNN, *10 Ways to Keep Your Diet GMO-Free*, available at: https://www.cnn.com/2014/03/25/health/upwave-gmo-free-diet/index.html.

72.     Despite touting the lack of certain dangerous substances in its baby food, Defendant fails to disclose elevated levels of Toxic Heavy Metals on the labels of Defendant's baby food products.

73.     Similarly, despite touting the presence of "iron to help support learning ability" in Gerber Brand Baby Food, Gerber fails to disclose the fact that its baby food contains other substances—*i.e.*, Toxic Heavy Metals—that have the exact opposite effect.

74.     While Defendant's omissions regarding the material fact that its baby food products contain elevated levels of Toxic Heavy Metals are legally significant on their own, Defendant's representations regarding the presence of "iron to help support learning ability" and the lack of BPA and GMOs are also significant.  Although these representations may be true, "a statement that is technically true may nevertheless be fraudulent where it omits qualifying material since a 'half-truth' is sometimes more misleading than an outright lie." *Abazari v. Rosalind Franklin Univ. of Med. & Sci.*, 2015 IL App (2d) 140952, ¶ 33 (citing cases); *see also Heider v. Leewards Creative Crafts, Inc.*, 245 Ill.App.3d 258, 265 (2nd Dist. 1993) ("A statement which is technically true as far as it goes may nonetheless be fraudulent if it is misleading because it does not state matters which materially qualify that statement."); W. Prosser, Law of Torts § 106, at 696 (4th ed. 1971) ("half the truth may obviously amount to a lie, if it is understood to be the whole.").

75.     For example, in representing that Defendant's baby food products lack BPA and GMOs, Defendant represents that its baby food products lack substances that consumers would consider to be deleterious to human health. This is, however, only a "half-truth" as Defendant's baby food products do, in fact, contain deleterious substances—*i.e.*, Toxic Heavy Metals.

76.     Gerber's representations regarding the presence of "iron to help support learning ability" in Gerber Brand Baby Food is also a "half-truth," as it fosters the understanding that the

ingredients in Gerber Brand Baby Food will *promote* childhood brain development, when, in fact, Gerber Brand Baby Food contains Toxic Heavy Metals, which are proven to *impede* childhood brain development.

### Consumer Expectations Regarding Baby Food

77.     Parents' instinctive desire to protect and ensure the healthy development of their children is well-known.  As such, the safety of baby food is of paramount importance, and is a material fact, to consumers (such as Plaintiffs and Class members).

78.     More specifically, given the negative effects of Toxic Heavy Metals (such as arsenic, lead, cadmium, and mercury) on child development, the presence of these substances in baby food is a material fact to consumers (such as Plaintiffs and members of the Class).  Indeed, consumers—such as Plaintiffs and members of the Class—are unwilling to purchase baby food that contains elevated levels of Toxic Heavy Metals.

79.     Defendant knows that the safety of its brand of baby food (as a general matter) is a material fact to consumers. This is exemplified by the fact that Defendant's baby food products are marketed and labeled as *lacking* certain substances (*e.g.*, BPA, GMOs) that consumers believe would be deleterious to the health of children.

80.     Defendant also knows that consumers (such as Plaintiffs and members of the Class) are unwilling to purchase its baby food products that contain elevated levels of Toxic Heavy Metals.

81.     As such, Defendant also knows that the presence of Toxic Heavy Metals in its baby food products is a material fact to consumers (such as Plaintiffs and Class members).

82.     Baby food manufacturers (such as Defendant) hold a special position of public trust. Consumers believe that they would not sell products that are unsafe to their infants. *See*, Subcommittee Report, p. 6.

83.     Defendant knew that if the elevated levels of Toxic Heavy Metals in its baby food products was disclosed to Plaintiffs and Class members, then Plaintiffs and Class members would be unwilling to purchase Defendant's Baby Food.

84.     In light of Defendant's knowledge that Plaintiffs and Class members would be unwilling to purchase baby food if they knew that its baby food products contained elevated levels of Toxic Heavy Metals, Defendant intentionally and knowingly concealed this fact from Plaintiffs and Class members, and did not disclose the presence of these Toxic Heavy Metals on the labels of Defendant's baby food products.

85.     Defendant knew that Plaintiffs and Class members would rely upon the representations and omissions contained on the packages of Defendant's baby food products, and intended for them to do so.

86.     Defendant knew that in relying upon the representations and omissions contained on the packages of Defendant's baby food products, Plaintiffs and Class members would view those products as being safe for consumption, given their represented lack of certain deleterious substances (*e.g.*, BPA, GMOs), and Defendant's concealment of the fact that baby food products contained elevated levels of Toxic Heavy Metals.

87.     Prior to purchasing Defendant's baby food products, Plaintiffs and Class members were exposed to, saw, read, and understood Defendant's representations and omissions regarding the safety of its baby food, and relied upon them.

88.     As a result of Defendant's representations regarding the safety of its baby food, and the lack of certain deleterious substances (*e.g.*, BPA, GMOs), and Defendant's concealment of the fact that its brand of baby food contained elevated levels of Toxic Heavy Metals, Plaintiffs and Class members reasonably believed that Defendant's baby food products were free from substances that would negatively affect children's development.

89.     In reliance upon Defendant's representations and omissions, Plaintiffs and Class members purchased Defendant's baby food products.

90.     Had Plaintiffs and Class members known the truth—*i.e.*, that Defendant's brand of baby food contained elevated levels of Toxic Heavy Metals, rendering it unsafe for consumption by children—they would not have been willing to purchase it at all.

91.     Therefore, as a direct and proximate result of Defendant's misrepresentations and omissions concerning its brand of baby food, Plaintiffs and Class members purchased Defendant's baby food products.

92.     Plaintiffs and Class members were harmed in the form of the money they paid for Defendant's baby food products which they would not otherwise have paid had they known the truth.  Since the presence of elevated levels of Toxic Heavy Metals in baby food renders it unsafe for human consumption, the Defendant's baby food products that Plaintiffs and Class members purchased is worthless.

### *Plaintiff Edelin Altuve Purchased Defendant's Contaminated Baby Food*

93.     On numerous occasions between March 2020 and February 2021, Altuve purchased several different varieties of Gerber Brand Baby Food in North Dakota and Florida. Many of the varieties of Gerber Brand Baby Food that Altuve purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

15

a.    Gerber Brand Baby Food from Gerber containing rice flour with excessive levels of one or more Toxic Heavy Metals, including Teether Wheels Apple Harvest, Probiotic Rice Banana Apple Cereal, Multigrain Baby Cereal, and Banana-flavored, Sweet Potato-flavored, and Blueberry-flavored Puffs.

### Plaintiff Jenny Anderson Purchased Defendant's Contaminated Baby Food

94.    On numerous occasions between October 2020 and February 2021, Anderson purchased several different varieties of Gerber Brand Baby Food in Washington. Many of the varieties of Gerber Brand Baby Food that Anderson purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a.    Gerber Brand Baby Food from Gerber containing rice flour and carrots with excessive levels of one or more Toxic Heavy Metals, including Gerber Rice Cereal, Gerber Pear Carrot Pea with Vitamin C, and Gerber Natural Carrots Jars.

### Plaintiff Carrie Ashbourne Purchased Defendant's Contaminated Baby Food

95.    On numerous occasions in between 2017 and 2020, Ashbourne purchased several different varieties of Gerber Brand Baby Food in New Jersey. Many of the varieties of Gerber Brand Baby Food that Ashbourne purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a.    Gerber Brand Baby Food from Gerber containing rice flour, sweet potatoes, carrots, and grape juice with excessive levels of one or more Toxic Heavy Metals, including Lil' Crunchies Mild Cheddar and Rice Single Grain Cereal.

### Plaintiff Ashlee Campion Purchased Defendant's Contaminated Baby Food

96.    On numerous occasions between 2017 and 2018, Campion purchased several different varieties of Gerber Brand Baby Food in Texas. Many of the varieties of Gerber Brand Baby Food that Campion purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a.      Gerber Brand Baby Food from Gerber containing rice, peach puree, carrots, and sweet potatoes with excessive levels of one or more Toxic Heavy Metals, including Gerber Organic 3rd Foods Baby Food, Peaches, Apricots & Carrots with Yogurt, Gerber Lil Entrees Mashed Potatoes and Meatloaf Nuggets in Gravy with Carrots Peas and Corn, and Gerber Yellow Rice and Chicken with Vegetables in Sauce with Green Beans and Carrots.

***Plaintiff Jessica Conner Purchased Defendant's Contaminated Baby Food***

97.     On numerous occasions between 2020 and 2021, Conner purchased several different varieties of Gerber Brand Baby Food from stores in West Virginia. Many of the varieties of Gerber Brand Baby Food that Conner purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a.      Gerber Brand Baby Food from Gerber containing rice flour and carrots with excessive levels of one or more Toxic Heavy Metals, including Gerber Rice Cereal, Gerber Pear Carrot Pea with Vitamin C, and Gerber Natural Carrots Jars.

***Plaintiff Brandy Daniels Purchased Defendant's Contaminated Baby Food***

98.     On numerous occasions in 2020, Daniels purchased several different varieties of Gerber Brand Baby Food in North Carolina. Many of the varieties of Gerber Brand Baby Food that Daniels purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a.      Gerber Brand Baby Food from Gerber containing carrots, sweet potato, and rice with excessive levels of one or more Toxic Heavy Metals, including Gerber Garden Veggies & Rice Puree.

***Plaintiff Aileen Garces Purchased Defendant's Contaminated Baby Food***

99.     On numerous occasions between November 2020 and February 4, 2021, Garces purchased several different varieties of Gerber Brand Baby Food in Illinois. Many of the varieties of Gerber Brand Baby Food that Garces purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

17

    a.    Gerber Brand Baby Food from Gerber containing dried apple juice and rice flour with excessive levels of one or more Toxic Heavy Metals, including Gerber's Teethers Strawberry Apple Spinach Wafers, and Teethers Banana Peach Wafers.

*Plaintiff April Gillens Purchased Defendant's Contaminated Baby Food*

100.    On numerous occasions between September 2020 and February 2021 Gillens purchased several different varieties of Gerber Brand Baby Food in Washington, D.C. Many of the varieties of Gerber Brand Baby Food that Gillens purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

    a.    Gerber Brand Baby Food from Gerber containing carrots, sweet potato, and banana with excessive levels of one or more Toxic Heavy Metals, including Carrot Puree, Sweet Potato Puree, and Banana Puree.

*Plaintiff Jandrea Glenn Purchased Defendant's Contaminated Baby Food*

101.    On numerous occasions between December 2020 and February 2021, Glenn purchased several different varieties of Gerber Brand Baby Food in Colorado. Many of the varieties of Gerber Brand Baby Food that Glenn purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

    a.    Gerber Brand Baby Food from Gerber containing banana, lemon juice concentrate, and organic carrot with excessive levels of Toxic Heavy Metals, including Gerber Organic Banana, and Organic Carrot.

*Plaintiff Elizabeth Hall Purchased Defendant's Contaminated Baby Food*

102.    On numerous occasions between 2019 and 2021, Hall purchased Gerber Brand Baby Food in New Hampshire. Many of the varieties of Gerber Brand Baby Food that Hall purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a. Gerber Brand Baby Food from Gerber containing rice flour, sweet potato, and banana with excessive levels of one or more Toxic Heavy Metals, including Puffs Strawberry Apple, Puffs Banana, Puffs Sweet Potato, Rice Rusks Banana Peach, and Rice Single Grain Cereal.

**Plaintiff Amber Hogan Purchased Defendant's Contaminated Baby Food**

103. On numerous occasions between October 2017 and October 2020, Hogan purchased Gerber Brand Baby Food in Alaska and Florida. Many of the varieties of Gerber Brand Baby Food that Hogan purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a. Gerber Brand Baby Food from Gerber containing rice flour with excessive levels of one or more Toxic Heavy Metals, including Multigrain Cereal.

**Plaintiff Laszlo Kovacs Purchased Defendant's Contaminated Baby Food**

104. On numerous occasions between 2015 and 2021, Kovacs purchased Gerber Brand Baby Food in Tennessee. Many of the varieties of Gerber Brand Baby Food that Kovacs purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a. Gerber Brand Baby Food from Gerber containing banana with excessive levels of one or more Toxic Heavy Metals, including Organic Oatmeal Banana Cereal.

**Plaintiff Cori Lau Purchased Defendant's Contaminated Baby Food**

105. On numerous occasions in 2019 and 2020, Lau purchased several different varieties of Gerber Brand Baby Food in Nevada. Many varieties of Gerber Brand Baby Food that Lau purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a. Gerber Brand Baby Food from Gerber containing carrot and sweet potato with excessive levels of one or more Toxic Heavy Metals, including My 1st Veggies Starter Kit and Apple, and Purple Carrot & Blueberry with Yogurt Food Pouch.

19

### *Plaintiff Michelle Lyles Purchased Defendant's Contaminated Baby Food*

106.   On numerous occasions between March 2020 and February 2021, Lyles purchased several different varieties of Gerber Brand Baby Food in Maryland. Many of the varieties of Gerber Brand Baby Food that Lyles purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

      a.   Gerber Brand Baby Food from Gerber containing rice flour with excessive levels of one or more Toxic Heavy Metals, including Rice Single Grain Cereal.

### *Plaintiff Shalaya Martin Purchased Defendant's Contaminated Baby Food*

107.   On numerous occasions in January 2021, Martin purchased several different varieties of Gerber Brand Baby Food in New York. Many of the varieties of Gerber Brand Baby Food that Martin purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

      a.   Gerber Brand Baby Food from Gerber containing rice flour with excessive levels of one or more Toxic Heavy Metals, including Rice Cereal.

### *Plaintiff Christina Martinson Purchased Defendant's Contaminated Baby Food*

108.   On numerous occasions from approximately August 2020 to January 2021, Martinson purchased several different varieties of Gerber Brand Baby Food in Georgia. Many of the varieties of Gerber Brand Baby Food that Martinson purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

      a.   Gerber Brand Baby Food from Gerber containing rice flour, grape juice concentrate, and banana with excessive levels of one or more Toxic Heavy Metals, including Gerber Organic Mango Baby Puree, Yogurt Melts Banana Vanilla, and Teether Wheels Apple Harvest.

### *Plaintiff Melissa Mejia Purchased Defendant's Contaminated Baby Food*

109.    On many occasions in 2019 and 2020, Mejia purchased several different varieties of Gerber Brand Baby Food in North Carolina. Many of the varieties of Gerber Brand Baby Food that Mejia purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

> a.    Gerber Brand Baby Food from Gerber containing organic bananas with excessive levels of one or more Toxic Heavy Metals, including Gerber Oat Milk Banana Squash Mango Pineapple Smoothie.

### *Plaintiff Chey'na Micciche Purchased Defendant's Contaminated Baby Food*

110.    On numerous occasions between 2016 and 2018, Micciche purchased several different varieties of Gerber Brand Baby Food in California. Many of the varieties of Gerber Brand Baby Food that Micciche purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

> a.    Gerber Brand Baby Food from Gerber containing banana, carrot, sweet potato with excessive levels of Toxic Heavy Metals, including Apple Strawberry Banana Puree, Carrot Puree, and Sweet Potato Puree.

### *Plaintiff Julia Milton Purchased Defendant's Contaminated Baby Food*

111.    On many occasions between June 2020 and February 2021, Milton purchased several different varieties of Gerber Brand Baby Food in Michigan. Many of the varieties of Gerber Brand Baby Food that Milton purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

> a.    Gerber Brand Baby Food from Gerber containing rice flour, sweet potatoes, banana, and white grape juice with excessive levels of one or more Toxic Heavy Metals, including Banana Puffs, Strawberry Apple Puffs, Sweet Potato Puffs, Fruit & Veggie Melts Very Berry Blend, and Fruit & Veggie Tropical Blend.

*Plaintiff Ashley Morgan Purchased Defendant's Contaminated Baby Food*

112.    On numerous occasions in 2020, Morgan purchased several different varieties of Gerber Brand Baby Food in Arizona. Many of the varieties of Gerber Brand Baby Food that Morgan purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

       a.    Gerber Brand Baby Food from Gerber containing carrots with excessive levels of one or more Toxic Heavy Metals, including Macaroni & Cheese and a Side of Seasoned Peas & Carrots, Mashed Potatoes & Gravy with Roasted Chicken and a Side of Carrots, and Banana Carrot Mango Puree.

*Plaintiff Michael Morrow Purchased Defendant's Contaminated Baby Food*

113.    On numerous occasions in 2020 and 2021, Morrow purchased several different varieties of Gerber Brand Baby Food in California, and on numerous occasions in 2020, Morrow purchased several different varieties of Gerber Brand Baby Food in Nevada. Many of the varieties of Gerber Brand Baby Food that Morrow purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

       a.    Gerber Brand Baby Food from Gerber containing rice flour with excessive levels of one or more Toxic Heavy Metals, including Gerber Puffs Apple Cinnamon, Gerber Hearty Bits Multigrain Banana Apple Strawberry, and Rice Cereal.

*Plaintiff Stacy Musto Purchased Defendant's Contaminated Baby Food*

114.    On numerous occasions in 2019 and 2020, Musto purchased several different varieties of Gerber Brand Baby Food in Missouri. Many of the varieties of Gerber Brand Baby Food that Musto purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

       a.    Gerber Brand Baby Food from Gerber containing carrots with one or more Toxic Heavy Metals, including Organic Carrot Apple Mango.

***Plaintiff Chris Nalley Purchased Defendant's Contaminated Baby Food***

115.   On numerous occasions between May 2020 and early February 2021, Nalley purchased several different varieties of Gerber Brand Baby Food in Missouri. Many of the varieties of Gerber Brand Baby Food and that Nalley purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a.   Gerber Brand Baby Food from Gerber containing carrot with excessive levels of one or more Toxic Heavy Metals, including Organic Pumpkin Banana Carrot Puree.

***Plaintiff Gladys Okolo Purchased Defendant's Contaminated Baby Food***

116.   On numerous occasions between July 2020 and January 2021, Okolo purchased several different varieties of Gerber Brand Baby Food in Virginia. Many of the varieties of Gerber Brand Baby Food that Okolo purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a.   Gerber Brand Baby Food from Gerber containing bananas with one or more Toxic Heavy Metals, including Gerber Infant Natural Banana Puree.

***Plaintiff Queen Pough Purchased Defendant's Contaminated Baby Food***

117.   On numerous occasions between the end of 2018 and the beginning of 2021, Pough purchased several different varieties of Gerber Brand Baby Food in North Carolina. Many of the varieties of Gerber Brand Baby Food that Pough purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a.   Gerber Brand Baby Food from Gerber containing rice flour and banana with excessive levels of one or more Toxic Heavy Metals, including Gerber Single Grain Rice Baby Cereal, MultiGrain Cereal, and Gerber Oatmeal Banana Probiotic.

***Plaintiff Cortney Powell Purchased Defendant's Contaminated Baby Food***

118.   On numerous occasions between 2020 and 2021, Powell purchased several

different varieties of Gerber Brand Baby Food in Montana. Many of the varieties of Gerber Brand Baby Food that Powell purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a.   Gerber Brand Baby Food from Gerber containing sweet potato, banana, and carrot with excessive levels of one or more Toxic Heavy Metals, including Banana Carrot Mango Puree, Pea Carrot Spinach Puree, Sweet Potato Puree, and Hawaiian Delight Puree.

### Plaintiff Amy Prondzinski Purchased Defendant's Contaminated Baby Food

119.   On numerous occasions between September 2019 and December 2020, Prondzinski purchased several different varieties of Gerber Brand Baby Food in Wisconsin. Many of the varieties of Gerber Brand Baby Food that Prondzinski purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a.   Gerber Brand Baby Food from Gerber containing sweet potato, banana, rice flour, and carrot with excessive levels of one or more Toxic Heavy Metals, including Puffs Sweet Potato, Puffs Banana, Mashed Potatoes & Meatloaf in Gravy and a Side of Carrots, Peas, and Corn, 2nd Foods Banana, 2nd Foods Apple, Strawberry Banana, 2nd Foods Sweet Potatoes, Toddler Pouches Banana Blueberry, and Toddler Pouches Apple Sweet Potato with Cinnamon.

### Plaintiff Jessica Reed Purchased Defendant's Contaminated Baby Food

120.   On numerous occasions between November 2019 and March 2020, Reed purchased several different varieties of Gerber Brand Baby Food in Alaska. Many of the varieties of Gerber Brand Baby Food that Reed purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

a.   Gerber Brand Baby Food from Gerber containing carrot, sweet potato, and banana with excessive levels of one or more Toxic Heavy Metals, including 2nd Foods Carrot Sweet Potato Pea, 2nd Foods Apple Strawberry Banana, 2nd Foods Sweet Potato, 2nd Foods Banana Blackberry Blueberry, and 2nd Foods Sweet Potato Turkey.

24

### Plaintiff Soraya Santos Purchased Defendant's Contaminated Baby Food

121.   On numerous occasions between October 2020 and February 2021, Santos purchased several different varieties of Gerber Brand Baby Food in Massachusetts. Many of the varieties of Gerber Brand Baby Food that Soraya purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

      a.   Gerber Brand Baby Food from Gerber containing rice flour and banana with excessive levels of one or more Toxic Heavy Metals, including Gerber Banana Peach Teethers, and Fruit & Veggie Melts Truly Tropical Blend.

### Plaintiff Kira Spurgeon Purchased Defendant's Contaminated Baby Food

122.   On numerous occasions in 2020 and early 2021, Spurgeon purchased several different varieties of Gerber Brand Baby Food in Iowa. Many of the varieties of Gerber Brand Baby Food that Spurgeon purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

      a.   Gerber Brand Baby Food from Gerber containing rice flour, grape juice concentrate, banana, carrot, and sweet potato with excessive levels of one or more Toxic Heavy Metals, including Rice Single Grain Cereal, Fruit & Veggie Melts Truly Tropical Blend, Puffs Sweet Potato, Carrot Puree, and Teethers Banana Peach, and Turkey & Rice.

### Plaintiff Lindsey Tarlton Purchased Defendant's Contaminated Baby Food

123.   On numerous occasions between January 2019 and December 2020, Tarlton purchased several varieties of Gerber Brand Baby Food in Indiana. Many of the varieties of Gerber Brand Baby Food that Tarlton purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

      a.   Gerber Brand Baby Food from Gerber containing sweet potatoes, and rice flour with excessive levels of one or more Toxic Heavy Metals, including Gerber Rice Single Grain Cereal, Whole Grain Cereal, and Sweet Potato Mango Kale.

### *Plaintiff Lidia Tilahun Purchased Defendant's Contaminated Baby Food*

124. On numerous occasions between 2019 and 2020, Tilahun purchased several varieties of Gerber Brand Baby Food in California. Many of the varieties of Gerber Brand Baby Food that Tilahun purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

        a. Gerber Brand Baby Food from Gerber containing sweet potato and carrot with excessive levels of one or more Toxic Heavy Metals, including Chicken & Rice Nutritious Dinner and Sweet Potato & Turkey with Whole Grains Dinner.

### *Plaintiff Julia Vice Purchased Defendant's Contaminated Baby Food*

125. On numerous occasions between August 2020 and January 2021, Vice purchased several different varieties of Gerber Brand Baby Food in Ohio. Many of the varieties of Gerber Brand Baby Food that Vice purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

        a. Gerber Brand Baby Food from Gerber containing rice flour, carrots, sweet potatoes, and apple juice with excessive levels of one or more Toxic Heavy Metals, including Sweet Potato Corn, Sweet Potato Turkey, Banana Plum Grape, and Banana Carrot Mango.

### *Plaintiff Damen Walton Purchased Defendant's Contaminated Baby Food*

126. On numerous occasions between June 2020 and February 2021, Walton purchased Gerber Brand Baby Food in Iowa. Many of the varieties of Gerber Brand Baby Food that Walton purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

        a. Gerber Brand Baby Food from Gerber containing carrots with excessive levels of one or more Toxic Heavy Metals, including Carrot Puree 2-pack.

### *Plaintiff Jennifer Weiss Purchased Defendant's Contaminated Baby Food*

127. On numerous occasions between September 2020 and February 2021, Weiss

purchased Gerber Brand Baby Food in Pennsylvania. Many of the varieties of Gerber Brand Baby Food that Weiss purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

    a.    Gerber Brand Baby Food from Gerber containing rice flour, carrots and banana with lemon juice concentrate with excessive levels of one or more Toxic Heavy Metals, including Rice Single Grand Cereal, Multigrain Cereal, Puffs Banana Cereal, Carrot Puree, and Apricot Mixed Fruit Puree.

### *Plaintiff Janice Wilson Purchased Defendant's Contaminated Baby Food*

128.    On numerous occasions between January 2019 and January 2021, Plaintiff Wilson purchased Gerber Brand Baby Food in Texas. Many of the varieties of Gerber Brand Baby Food that Wilson purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

    a.    Gerber Brand Baby Food from Gerber containing rice flour, organic bananas, peaches, carrots, and green beans with excessive levels of one or more Toxic Heavy Metals, including Sweet Potato Puffs, Organic Fig Berry Puffs, Organic Banana Raspberry & Yogurt with Vanilla Puree, Banana Blackberry Blueberry Puree, Peach Puree, and Lil' Crunchies of various flavors.

### *Facts Relating to All Plaintiffs and Class Members*

129.    Prior to purchasing Gerber Brand Baby Food in retail stores and/or while shopping online, Plaintiffs and Class members were exposed to, saw, read, and understood Defendant's representations and omissions regarding the safety of its baby food, as well as the presence of elevated levels of Toxic Heavy Metals therein, and Plaintiffs and Class members relied upon them.

130.    Plaintiffs and Class members were only willing to purchase Gerber Brand Baby Food because they believed that the baby food did *not* contain elevated levels of Toxic Heavy Metals. Defendant advertises, markets, promotes, and sells food products specifically directed to babies and children, and conveys to consumers that its food is wholesome and is designed to meet

the unique nutritional and developmental needs of growing children. Plaintiffs' and Class members' belief that Defendant's baby food products were healthy and thus did not contain deleterious and toxic substances in unreasonable and excessive levels is bolstered by Defendant's representations regarding the presence of iron, representations of natural ingredients, representations that its products are organic, and the *lack* of BPA and GMOs in its brand of baby food.

131.    In reliance upon Defendant's representations and omissions, Plaintiffs and Class members purchased Gerber Brand Baby Food.

132.    Had Plaintiffs and Class members known the truth regarding the excessive levels of Toxic Heavy Metals in Defendant's baby food products, they would not have purchased them.

133.    The presence of Toxic Heavy Metals at the levels found in the Subcommittee Report in Gerber Brand Baby Food renders the baby food that Plaintiffs and Class members purchased worthless, unsafe for human consumption, and to an even greater extent not suited for consumption by the most vulnerable humans.

134.    Therefore, as a direct and proximate result of Defendant's misrepresentations and omissions concerning its brand of baby food, Plaintiffs and Class members suffered injury in fact in the form of the money they paid for Gerber Brand Baby Food—money they would not otherwise have paid to Defendant had they known the truth.

135.    Plaintiffs bring this action on behalf of themselves, and Classes of similarly situated individuals, seeking recovery of damages, including actual damages, enhanced, statutory, and punitive damages, as well as equitable relief, including restitution, disgorgement, and injunctive relief, reasonable attorneys' fees and costs, as allowed under the various causes of action set forth herein.

136.    Plaintiffs are likely to consider purchasing baby food products in the future provided that Defendant institutes corrective measures and cures its unfair and deceptive acts and practices. Should Defendant provide clear and non-misleading disclosures regarding the levels of Toxic Heavy Metals in its baby food, improve its sourcing of ingredients and manufacturing processes, and accurately and effectively test final products of its baby food for excessive levels of Toxic Heavy Metals, Plaintiffs would likely purchase baby food products from Defendant if they are truthfully labeled and do not contain excessive levels of Toxic Heavy Metals or other deleterious substances material to a parent or guardian's decision to purchase and feed food to their vulnerable and developing babies and children.

137.    Defendant is equitably estopped from asserting defenses relating to statutes of limitations. Not only did Defendant fail to disclose the elevated levels of Toxic Heavy Metals in its baby food, but Defendant also touted its brand of baby food as wholesome, natural, specially prepared to meet nutritional and developmental needs of babies and children, and lacking certain undesired substances, such as BPA and GMOs, and including certain beneficial substances, such as iron. In addition, Defendant concealed facts regarding the presence of Toxic Heavy Metals in its baby food by purposefully refusing to test the final products and relying upon flawed theoretical models to erroneously claim the levels of Toxic Heavy Metals in its finished products do not exceed Defendant's unreasonably high internal limits. Defendant also omitted and concealed the facts regarding the presence of Toxic Heavy Metals from the FDA and Congress. Finally, Defendant learned of the excessive levels of Toxic Heavy Metals in its baby food products through its own internal testing, and it knew about the excessive levels of Toxic Heavy Metals in its competitors' baby food products, yet it failed and refused to disclose that its competitors' products were unsafe for human consumption because all of its products were similarly unsafe for human

29

consumption. As such, Defendant actively and fraudulently concealed the true nature of the baby food.

## CLASS ALLEGATIONS

138.    **Class Definition**: Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23, on behalf of a nationwide class of similarly situated individuals and entities ("the Class"), defined as follows:

> All persons in the United States who purchased Gerber Brand Baby Food.

139.    **Alaska Subclass Definition**: Hogan and Reed bring this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Alaska Subclass"), defined as follows:

> All persons in Alaska who purchased Gerber Brand Baby Food.

140.    **Arizona Subclass Definition**: Morgan brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Arizona Subclass"), defined as follows:

> All persons in Arizona who purchased Gerber Brand Baby Food.

141.    **California Subclass Definition:** Tilahun, Morrow, and Micciche bring this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("California Subclass"), defined as follows:

> All persons in California who purchased Gerber Brand Baby Food.

142.    **Colorado Subclass Definition:** Glenn brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Colorado Subclass"), defined as follows:

> All persons in Colorado who purchased Gerber Brand Baby Food.

143. **Florida Subclass Definition:** Altuve and Hogan bring this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Florida Subclass"), defined as follows:

> All persons in Florida who purchased Gerber Brand Baby Food.

144. **Georgia Subclass Definition**: Martinson brings this action pursuant to Fed. R. Civ. P. 23, on behalf of similarly situated individuals and entities ("Georgia Subclass"), defined as follows:

> All persons in Georgia who purchased Gerber Brand Baby Food.

145. **Illinois Subclass Definition:** Garces brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Illinois Subclass"), defined as follows:

> All persons in Illinois who purchased Gerber Brand Baby Food.

146. **Indiana Subclass Definition:** Tarlton brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Indiana Subclass"), defined as follows:

> All persons in Indiana who purchased Gerber Brand Baby Food.

147. **Iowa Subclass Definition**: Spurgeon and Walton bring this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Iowa Subclass"), defined as follows:

> All persons in Iowa who purchased Gerber Brand Baby Food.

148. **Maryland Subclass Definition:** Lyles brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Maryland Subclass"), defined as follows:

All persons in Maryland who purchased Gerber Brand Baby Food.

149.   **Massachusetts Subclass Definition:** Santos brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Massachusetts Subclass"), defined as follows:

All persons in Massachusetts who purchased Gerber Brand Baby Food.

150.   **Michigan Subclass Definition**: Milton brings this action pursuant to Fed. R. Civ. P. 23 on behalf of a subclass of similarly situated individuals and entities ("Michigan Subclass"), defined as follows:

All persons in Michigan who purchased Gerber Brand Baby Food.

151.   **Missouri Subclass Definition**: Musto and Nalley bring this action pursuant to Fed. R. Civ. P. 23 on behalf of a subclass of similarly situated individuals and entities ("Missouri Subclass"), defined as follows:

All persons in Missouri who purchased Gerber Brand Baby Food.

152.   **Montana Subclass Definition:** Powell brings this action pursuant to Fed. R. Civ. P. 23 on behalf of a subclass of similarly situated individuals and entities ("Montana Subclass"), defined as follows:

All persons in Montana who purchased Gerber Brand Baby Food.

153.   **Nevada Subclass Definition:** Lau and Morrow bring this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Nevada Subclass"), defined as follows:

All persons in Nevada who purchased Gerber Brand Baby Food.

154. **New Hampshire Subclass Definition:** Hall brings this action pursuant to Fed. R. Civ. P. 23 on behalf of a subclass of similarly situated individuals and entities ("New Hampshire Subclass"), defined as follows:

> All persons in New Hampshire who purchased Gerber Brand Baby Food.

155. **New Jersey Subclass Definition:** Ashbourne brings this action pursuant to Fed. R. Civ. P. 23 on behalf of a subclass of similarly situated individuals and entities ("New Jersey Subclass"), defined as follows:

> All persons in New Jersey who purchased Gerber Brand Baby Food.

156. **New York Subclass Definition:** Martin brings this action pursuant to Fed. R. Civ. P. 23 on behalf of a subclass of similarly situated individuals and entities ("New York Subclass"), defined as follows:

> All persons in New York who purchased Gerber Brand Baby Food.

157. **North Carolina Subclass Definition**: Daniels, Mejia, and Pough bring this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("North Carolina Subclass"), defined as follows:

> All persons in North Carolina who purchased Gerber Brand Baby Food.

158. **North Dakota Subclass Definition:** Altuve brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("North Dakota Subclass"), defined as follows:

> All persons in North Dakota who purchased Gerber Brand Baby Food.

159. **Ohio Subclass Definition**: Vice brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Ohio Subclass"), defined as follows:

All persons in Ohio who purchased Gerber Brand Baby Food.

160.   **Pennsylvania Subclass Definition:** Weiss brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities (Pennsylvania Subclass"), defined as follows:

All persons in Pennsylvania who purchased Gerber Brand Baby Food.

161.   **Tennessee Subclass Definition**: Kovacs brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Tennessee Subclass"), defined as follows:

All persons in Tennessee who purchased Gerber Brand Baby Food.

162.   **Texas Subclass Definition**: Campion and Wilson bring this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Texas Subclass"), defined as follows:

All persons in Texas who purchased Gerber Brand Baby Food.

163.   **Virginia Subclass Definition**: Okolo brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Virginia Subclass"), defined as follows:

All persons in Virginia who purchased Gerber Brand Baby Food.

164.   **Washington Subclass Definition**: Anderson brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Washington Subclass"), defined as follows:

All persons in Washington who purchased Gerber Brand Baby Food.

165. **Washington D.C. Subclass Definition**: Gillens brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Washington D.C. Subclass"), defined as follows:

> All persons in Washington D.C. who purchased Gerber Brand Baby Food.

166. **West Virginia Subclass Definition**: Conner brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("West Virginia Subclass"), defined as follows:

> All persons in West Virginia who purchased Gerber Brand Baby Food.

167. **Wisconsin Subclass Definition:** Prondzinski brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Wisconsin Subclass"), defined as follows:

> All persons in Wisconsin who purchased Gerber Brand Baby Food.

168. Excluded from the Class and Subclasses are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class and Subclass(es); (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

169. **Numerosity**: The Class and Subclasses are each so numerous that joinder of individual members would be impracticable. While the exact number of Class members and Subclass members is presently unknown and can only be ascertained through discovery, Plaintiff believes that there are thousands of Class and Subclass members, if not more, as Defendant is one

of the seven largest manufacturers of baby food in the United States.  *See*, Subcommittee Report,

p. 2.

170.    **Commonality and Predominance**: There are several questions of law and fact

common to the claims of the Plaintiffs and members of the Classes, which predominate over any

individual issues, including:

a.    Whether the Gerber Brand Baby Food contains unsafe levels of Toxic Heavy Metals;

b.    Whether Defendant misrepresented to Plaintiffs and Class members that Gerber Brand Baby Food was safe for human consumption and did not contain elevated levels of Toxic Heavy Metals;

c.    Whether Defendant omitted and concealed the levels of Toxic Heavy Metals in Gerber Brand Baby Food:

d.    Whether the presence of elevated levels of Toxic Heavy Metals in Gerber Brand Baby Food is a material fact to Plaintiffs and Class members;

e.    The extent and amount of Plaintiffs' and Class members' damages;

f.    Whether Defendant's conduct constitutes unlawful acts or practices under each of the state consumer protection and unfair or deceptive practices statutes asserted herein;

g.    Whether Defendant's conduct constitutes fraudulent concealment;

h.    Whether Defendant was unjustly enriched by their improper conduct;

i.    Whether Plaintiffs and Class members are entitled to injunctive relief to (1) require Defendant to cease its unlawful and deceptive practices; (2) to implement and maintain adequate manufacturing procedures, final product testing procedures, and ingredient sourcing and inspection practices to ensure its baby food does not contain unsafe and unacceptable levels of heavy metals; and (3) impose clear and prominent disclosure requirements on its product packaging regarding the levels of Toxic Heavy Metals in its finished products; and

j.    Whether Defendant's conduct resulted in Defendant unjustly retaining a benefit to the detriment of Plaintiffs and Class members, and violated the fundamental principles of justice, equity, and good conscience.

171.    **Typicality**: Plaintiffs' claims are typical of the claims of the proposed Classes. All claims are based on the same legal and factual issues regarding Defendant's misrepresentations and omissions concerning the presence of elevated levels of Toxic Heavy Metals in Gerber Brand Baby Food.

172.    **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the proposed Classes, and Plaintiffs do not have any interests antagonistic to those of the proposed Classes.  Plaintiffs have retained competent counsel experienced in the prosecution of this type of litigation.

173.    **Superiority**: A class action can best secure the economies of time, effort and expense, and promote uniformity. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class members to prosecute their claims individually. Individual actions are not feasible and it is unlikely that individual members of the Class will prosecute separate actions. The trial and the litigation of Plaintiffs' claims as a class action will be manageable.

### COUNT 1
**(On Behalf of Plaintiffs Hogan, Reed, and the Alaska Subclass)**
**Violation of Alaska Unfair Trade Practices and Consumer Protection Act,**
**Alaska Stat. § 45.50.471, *et seq*.**

174.    Plaintiffs Hogan and Reed repeat paragraphs 1–173 as if fully set forth herein.

175.    In Alaska, "unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are declared to be unlawful." Alaska Stat. § 45-50-471(a).

176.    Defendant's conduct as alleged above constituted the following unfair and deceptive acts prohibited under Alaska law: representing that goods or services have sponsorship approval, characteristics, ingredients, uses, benefits, or quantities that they do not have (Alaska Stat. § 45-50-

471)(b)(4)); representing that goods are of a particular standard, quality or grade, if they are of another (Alaska Stat. § 45-50-471(b)(6)); advertising goods with intent not to sell them as advertised (Alaska Stat. § 45-50-471(b)(8)); engaging in conduct creating a likelihood of confusion or of misunderstanding and that misleads, deceives or damages a buyer or a competitor in connection with the sale or advertisement of goods (Alaska Stat. § 45-50-471(b)(11)); using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods (Alaska Stat. § 45-50-471(b)(12)).

177.    As alleged herein, Defendant has engaged and continues to engage in unfair and deceptive acts and practices by making false representations and omissions of material fact regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

178.    In the course of conducting business, Defendant committed unfair business practices by, among other things, misrepresenting and omitting material facts regarding the characteristic, benefits, and ingredients of its brand of baby food.

179.    Defendant knew of, or was willfully blind to, the excessive levels of Toxic Heavy Metals in its baby food products that it manufactured, packaged, marketed, distributed, and sold to Plaintiffs Hogan, Reed, and the Alaska Subclass, as Defendant's internal testing showed the excessive levels of Toxic Heavy Metals in the products.

180.    In the course of conducting business, Defendant committed unlawful and unfair acts and practices by, among other things, selling to Plaintiffs Hogan, Reed, and the Alaska

Subclass members baby food products that were misbranded and adulterated under the Food, Drug, and Cosmetic Act, 21 U.S.C. §331, and Alaska Stat. §§ 17-20-020–17-20-040.

181.   Defendant intended that Plaintiffs Hogan, Reed, and Alaska Subclass members rely on its false statements, misrepresentations, omissions, and concealment of material facts in purchasing its brand of baby food.

182.   Plaintiffs Hogan, Reed, and Alaska Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased its brand of baby food.

183.   Acting as reasonable consumers, had Plaintiffs Hogan, Reed, and Alaska Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

184.   Plaintiffs Hogan, Reed, and Alaska Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that the products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

185.   Acting as reasonable consumers, Plaintiffs Hogan, Reed, and Alaska Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that Defendant's baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiffs Hogan, Reed, and Alaska Subclass members first purchasing Defendant's baby food products.

186.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiffs Hogan, Reed, and members of the Alaska Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased Defendant's brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

### COUNT 2
**(On Behalf of Plaintiff Morgan and the Arizona Subclass)**
**Violation of Arizona Deceptive Trade Practices Act,**
**Ariz. Stat. § 44-1521, *et seq*.**

187.    Plaintiff Morgan repeats paragraphs 1–173 as if fully set forth herein.

188.    The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice under Arizona law. Ariz. Stat. § 44-1522.

189.    As alleged herein, Defendant has engaged and continues to engage in deceptive acts and practices by making false representations and concealment and omissions of material fact regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brands of baby food contained unsafe levels of Toxic Heavy Metals.

190.    Defendant engaged in false representations, omissions of material fact in sales and advertisements of its brand of baby food, which qualifies as merchandise under Arizona Statute § 44-1521(1), (5), (7).

191.    In connection with the sale or advertisement of merchandise, Defendant committed unfair business practices by, among other things, misrepresenting and omitting material facts regarding the characteristic, benefits, and ingredients of its brand of baby food.

192.    Defendant knew of, or was willfully blind to, the excessive levels of Toxic Heavy Metals in its baby food products that it manufactured, packaged, marketed, distributed, and sold to Plaintiff Morgan and the Arizona Subclass, as Defendant's internal testing showed the excessive levels of Toxic Heavy Metals in the products.

193.    In connection with the sale or advertisement of any merchandise, Defendant committed unlawful and unfair acts and practices by, among other things, selling to Plaintiff Morgan and the Arizona Subclass members baby food products that were misbranded and adulterated under the Food, Drug, and Cosmetic Act, 21 U.S.C. § 331, and Ariz. Stat. § 36-902(1)–(4).

194.    Defendant intended that Plaintiff Morgan and Arizona Subclass members rely on its false statements, misrepresentations, omissions, and concealment of material facts in purchasing its baby food products.

195.    Plaintiff Morgan and Arizona Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased its baby food products.

196.    Acting as reasonable consumers, had Plaintiff Morgan and Arizona Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

197.    Plaintiff Morgan and Arizona Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Gerber Brand Baby Food under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

198.    Acting as reasonable consumers, Plaintiff Morgan and Arizona Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Morgan and Arizona Subclass members first purchasing Defendant's baby food products.

199.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Morgan and members of the Arizona Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food products had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

## COUNT 3
**(On Behalf of Plaintiffs Micciche, Morrow, Tilahun, and the California Subclass)**
**Violation of California Business & Professions Code §§ 17200, *et seq*.**
**for Engaging in Unlawful, Unfair, and Deceptive Business Acts or Practices**

200.    Plaintiffs Micciche, Morrow, and Tilahun repeat paragraphs 1–173 as if fully set forth herein.

201.    California Business & Professions Code section 17200 (California's Unfair Competition Law) prohibits "unlawful," "unfair," or "fraudulent" business acts or practices and any false or misleading advertising.

202.    California Business & Professions Code section 17203 provides in pertinent part:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as

> may be necessary to restore to any person in interest any money or property,
> real or personal, which may have been acquired by means of such unfair
> competition. Any person may pursue representative claims or relief on behalf
> of others only if the claimant meets the standing requirements of Section
> 17204 and complies with Section 382 of the Code of Civil Procedure . . .

203.    As alleged above, Defendant has engaged and continues to unlawfully engage in fraudulent, unfair, and unlawful business practices by making false representations and omissions of material fact regarding its brand of baby food, including the misrepresentations that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

204.    In the course of conducting business, Defendant committed unfair business practices by, among other things, misrepresenting and omitting material facts regarding the characteristic, benefits, and ingredients of its baby food products.

205.    Defendant knew of, or was willfully blind to, the excessive levels of Toxic Heavy Metals in its baby food products that it manufactured, packaged, marketed, distributed, and sold to Plaintiffs Micciche, Morrow, Tilahun, and the California Subclass, as Defendant's internal testing showed the excessive levels of Toxic Heavy Metals in the products.

206.    In the course of conducting business, Defendant committed unlawful acts and practices by, among other things, selling to Plaintiffs Micciche, Morrow, Tilahun, and the California Subclass members baby food products that were misbranded and adulterated under the Food, Drug, and Cosmetic Act, 21 U.S.C. §331, and California Health and Safety Code §110545, because they were, bear, or contain non-naturally occurring and/or excessive levels of poisonous and deleterious substances that render them injurious to health of the baby and children who were the intended consumers of the baby food products, and under California Health and Safety Code

43

§110555, because they bear and contain food additives that are unsafe. *See* Cal. Health & Safety Code §§ 110625, 110630.

207.    In the course of conducting business, Defendant committed fraudulent acts or practices in violation of the California False Advertising Law, Cal. Bus. & Prof. Code § 17203.

208.    In the course of conducting business, Defendant committed fraudulent acts and practices by, among other things, making the aforementioned misrepresentations, omissions, and concealment that possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

209.    Defendant intended that Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members rely on its false statements, misrepresentations, omissions, and concealment of material fact in purchasing its baby food products.

210.    Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased its baby food products.

211.    Acting as reasonable consumers, had Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members been aware of the truth regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

212.    Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Gerber Brand Baby Food under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

213.    Acting as reasonable consumers, Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members could not have avoided the injuries suffered by purchasing

Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members first purchasing Defendant's baby food products.

214.    As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent acts or practices, Plaintiffs Micciche, Morrow, Tilahun, and members of the California Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

### COUNT 4
**(On Behalf of Plaintiffs Micciche, Morrow, Tilahun, and the California Subclass)**
**Violation of California Consumer Legal Remedies Act, Cal. Civ. Code § 1770, *et seq*.[8]**

215.    Plaintiffs Micciche, Morrow, and Tilahun repeat paragraphs 1–173 as if fully set forth herein.

216.    Defendant are persons under Cal. Civ. Code § 1761(c).

217.    Plaintiffs Micciche, Morrow, and Tilahun are consumers under Cal. Civ. Code § 1761(d) who purchased Defendant's baby food products.

218.    California's Consumer Legal Remedies Act, Cal. Civ. Code §1770, *et seq*. ("CLRA"), prohibits unfair methods of competition and unfair or deceptive acts or practices intended to result in the sale of goods to consumers, including but not limited to:

        a.    Representing that goods have sponsorship, approval, characteristics,

---

[8] Micciche, Morrow, and Tilahun have sent a demand letter to Defendant, and reserve the right to amend their claims to include a claim for damages under the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1770, *et seq*., should Defendant fail to timely and satisfactorily meet their demands.

ingredients, uses, benefits, or quantities that they do not have (§ 1770(a)(5));

b.      Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another (§ 1770(a)(7));

c.      Advertising goods with intent not to sell them as advertised (§ 1770(a)(9)).

219.    Defendant violated the foregoing provisions of the CLRA by selling its baby food products that were unsafe for human consumption, and by omitting that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

220.    In the course of conducting business, Defendant committed fraudulent acts and practices by, among other things, making the aforementioned misrepresentations, omissions, and concealment that possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

221.    Defendant intended that Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members rely on their false statements, misrepresentations, omissions, and concealment of material fact in purchasing its baby food products.

222.    Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased its baby food products.

223.    Acting as reasonable consumers, had Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members been aware of the truth regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase the products.

224.    Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under

the belief that the products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

225. Acting as reasonable consumers, Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiffs Micciche, Morrow, Tilahun, and California Subclass members first purchasing Defendant's baby food products.

226. As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent acts or practices, Plaintiffs Micciche, Morrow, Tilahun, and members of the California Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

227. Pursuant to § 1782(d) of the CLRA, Plaintiffs Micciche, Morrow, and Tilahun, individually and on behalf of similarly situated California Subclass members, seek a Court order enjoining the above-described wrongful acts and practices of Defendant, ordering Defendant to remove its unsafe products from store shelves and recall all of its products containing ingredients that render its baby food unsafe for human consumption, and take other corrective measures, such as corrective labeling and improvement of food manufacturing standards, procedures, and testing.

228. Plaintiffs Micciche, Morrow, and Tilahun have provided the requisite notice and demand letter to Defendant, and seek monetary damages and all other forms of relief to which they

are entitled.

## COUNT 5
**(On Behalf of Plaintiff Glenn and the Colorado Subclass)**
**Violation of Colorado Consumer Protection Act ("CCPA"),**
**Colo. Rev. Stat. §§6-1-101, *et seq*.**

229.    Plaintiff Glenn repeats paragraphs 1–173 as if fully set forth herein.

230.    Colorado law prohibits the following deceptive trade practices: knowingly or recklessly making a false representation as to the characteristics, ingredients, uses, benefits, alteration, or quantities of goods, food, services, or property (Colo. Rev. Stat. § 6-1-105(e)); representing that goods, food, services, or property are of a particular standard, quality, or grade if he knows or should know that they are of another (Colo. Rev. Stat. § 6-1-105(g)); advertising goods, services, or property with intent not to sell them as advertised (Colo. Rev. Stat. § 6-1-105(i)); failing to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction (Colo. Rev. Stat. § 6-1-105(u)); and knowing or recklessly engaging in unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent practice (Colo. Rev. Stat. § 6-1-105(kkk)).

231.    Plaintiff Glenn and Colorado Subclass members are consumers under the CCPA who purchased Defendant's baby food products.

232.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

233.    Defendant's misrepresentations, omissions, and concealment regarding its brand of baby food constitutes deceptive and unconscionable acts or practices prohibited by the CCPA.

48

234.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

235.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of its brand of baby food to Plaintiff Glenn and the Colorado Subclass.

236.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

237.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Colo. Rev. Stat. 25-5-403.

238.    Defendant intended that Plaintiff Glenn and Colorado Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing its baby food products.

239.    Plaintiff Glenn and Colorado Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased its baby food products.

240.    Acting as reasonable consumers, had Plaintiff Glenn and Colorado Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase the products.

241.    Plaintiff Glenn and Colorado Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that the products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

242.    Acting as reasonable consumers, Plaintiff Glenn and Colorado Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products

because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Glenn and Colorado Subclass members first purchasing Defendant's baby food products.

243.    As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Glenn and members of the Colorado Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

244.    Plaintiff Glenn, individually and on behalf of similarly situated Colorado Subclass members, seeks a Court order enjoining the above-described wrongful acts and practices of Defendant, ordering Defendant to remove its unsafe products from store shelves and recall all of its products containing ingredients that render its baby food unsafe for human consumption, and take other corrective measures, such as corrective labeling and improvement of food manufacturing standards, procedures, and testing. Plaintiff Glenn and Colorado Subclass members also seek damages, equitable relief, attorney's fees and costs, to the furthest extent allowed under Colorado law.

## COUNT 6
**(On Behalf of Plaintiffs Altuve, Hogan, and the Florida Subclass)**
**Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**Fla. Stat. § 501.201, *et seq*.**

245.    Plaintiffs Altuve and Hogan repeat paragraphs 1–173 as if fully set forth herein.

246. The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. ("FDUTPA"), provides protection to consumers by mandating fair competition in commercial markets for goods and services.

247. The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

248. The FDUTPA applies to Defendant's acts or practices as described herein because Defendant's acts or practices occurred in the conduct of trade or commerce. Fla. Stat. § 501.203(8).

249. Plaintiffs Altuve, Hogan, and each member of the Florida Subclass are "consumers," as defined by Fla. Stat. § 501.203(7).

250. Defendant's baby food products fall within FDUTPA because they are a "good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value." Fla. Stat. § 501.203(8).

251. Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that their brands of baby food were safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

252. Defendant's misrepresentations, omissions, and concealment regarding its baby food products constitute deceptive and unconscionable acts or practices prohibited by the FDUTPA.

253. Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

51

254.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiffs Altuve, Hogan, and the Florida Subclass.

255.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

256.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Fla. Stat. § 500.11.

257.    Defendant intended that Plaintiffs Altuve, Hogan, and Florida Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

258.    Plaintiffs Altuve, Hogan, and Florida Subclass members reasonably relied on Defendant's respective misrepresentations, omissions, and concealment when they purchased its baby food products.

259.    Acting as reasonable consumers, had Plaintiffs Altuve, Hogan, and Florida Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase the products.

260.    Plaintiffs Altuve, Hogan, and Florida Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that the products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

261.    Acting as reasonable consumers, Plaintiffs Altuve, Hogan, and Florida Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food

products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiffs Altuve, Hogan, and Florida Subclass members first purchasing Defendant's baby food products.

262.     As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiffs Altuve, Hogan, and members of the Florida Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

263.     Plaintiffs Altuve and Hogan, individually and on behalf of similarly situated Florida Subclass members, seek a Court order enjoining the above-described wrongful acts and practices of Defendant, ordering Defendant to remove its unsafe products from store shelves and recall all of its products containing ingredients that render its baby food unsafe for human consumption, and take other corrective measures, such as corrective labeling and improvement of food manufacturing standards, procedures, and testing. Plaintiffs Altuve, Hogan, and Florida Subclass members also seek damages, equitable relief, attorney's fees and costs, to the furthest extent allowed under Florida law.

### COUNT 7
**(On Behalf of Plaintiff Martinson and the Georgia Subclass)**
**Violation of Georgia Uniform Deceptive Trade Practices Act ("GUDTPA")**
**O.C.G.A. §§ 10-1-370, *et seq*.**

264.     Plaintiff Martinson repeats paragraphs 1–173 as if fully set forth herein.

265.    Plaintiff Martinson and the Georgia Subclass members are persons within the meaning of § 10-1-371(5) of the GUDTPA.

266.    Defendant engaged in deceptive trade practices in the conduct of its business, in violation of O.C.G.A. § 10-1-372(a), including:

      a.    Representing that goods or services have characteristics that they do not have;

      b.    Representing that goods or services are or a particular standard, quality, or grade if they are of another;

      c.    Advertising goods or services with intent not to sell them as advertised; and

      d.    Engaging in conduct that creates a likelihood of confusion or misunderstanding.

267.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Martinson and Georgia Subclass members.

268.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

269.    Defendant intended that Plaintiff Martinson and Georgia Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

270.    Plaintiff Martinson and Georgia Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

271.    Acting as reasonable consumers, had Plaintiff Martinson and Georgia Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

272.    Plaintiff Martinson and Georgia Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that the products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

273.    Acting as reasonable consumers, Plaintiff Martinson and Georgia Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Martinson and Georgia Subclass members first purchasing Defendant's baby food products.

274.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Martinson and Georgia Subclass members suffered damages and ascertainable losses of money and property by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals. Plaintiff Martinson and Georgia Subclass members therefore seek all relief allowed by law, including injunctive relief and reasonable attorneys' fees and costs, under O.C.G.A. § 10-1-373.

**COUNT 8**
**(On Behalf of Plaintiff Martinson and the Georgia Subclass)**
**Violation of Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*.**

275.    Plaintiff Martinson repeats paragraphs 1–173 as if fully set forth herein.

276.    The Fair Business Practices Act protects consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce. O.C.G.A. § 10-1-391(a).

277.    Plaintiff Martinson and Georgia Subclass members are "consumers." O.C.G.A. § 10-1-392(6).

278.    In the course of trade and commerce, Defendant sold its baby food products in consumer transactions. O.C.G.A § 10-1-392(10), (28).

279.    Defendant's false, misleading, and deceptive misrepresentations, and omissions, concealment, and suppression of material facts as described herein constitute the following unfair or deceptive acts and are unlawful: representing that foods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that goods are of a particular standard, quality, or grade or that goods are of a particular model or style, if they are of another; advertising goods with intent not to sell them as advertised. O.C.G.A. § 10-1-393(b)(5), (7), (9).

280.    Defendant intended that Plaintiff Martinson and Georgia Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

281.    Plaintiff Martinson and Georgia Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

282.     Acting as reasonable consumers, had Plaintiff Martinson and Georgia Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

283.     Plaintiff Martinson and Georgia Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that they were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

284.     Acting as reasonable consumers, Plaintiff Martinson and Georgia Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not readily available to Plaintiff Martinson and Georgia Subclass members at the time they purchased Defendant's baby food products.

285.     As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Martinson and Georgia Subclass members suffered damages and ascertainable losses of money and property by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

286.     All conditions precedent have occurred or been performed, including the sending of a proper demand letter.

**COUNT 9**
**(On Behalf of Plaintiff Garces and the Illinois Subclass)**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"),**
**815 ILCS 505/1, *et seq.***

287.     Plaintiff Garces repeats paragraphs 1–173 as if fully set forth herein.

288.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.*, provides protection to consumers by mandating fair competition in commercial markets for goods and services.

289.     The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act". 815 ILCS 505/2.

290.     The ICFA applies to Defendant's acts as described herein because it applies to transactions involving the sale of goods or services to consumers.

291.     Defendant is a "person," as defined by 815 ILCS 505/1(c).

292.     Plaintiff Garces and each member of the Illinois Subclass are "consumers," as defined by 815 ILCS 505/1(e), because they purchased Defendant's baby food products.

293.     Defendant's baby food products are "merchandise," as defined by 815 ILCS 505/1(b).

294.     Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

295.    Defendant's respective misrepresentations and omissions regarding Defendant's baby food products constitute deceptive and unfair acts or practices prohibited by the ICFA.

296.    Defendant's aforementioned misrepresentations and omissions possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

297.    Defendant's aforementioned misrepresentations and omissions were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Garces and the Illinois Subclass.

298.    Defendant's aforementioned misrepresentations and omissions are unfair business practices because they offend public policy and/or cause substantial injury to consumers.

299.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and section 620/11(a) of the Illinois Food, Drug, and Cosmetic Act.

300.    Defendant intended that Plaintiff Garces and Illinois Subclass members rely on its aforementioned false statements, misrepresentations, and omissions of material fact in purchasing Defendant's baby food products.

301.    Plaintiff Garces and Illinois Subclass members reasonably relied on Defendant's misrepresentations and omissions when they purchased Defendant's baby food products.

302.    Acting as reasonable consumers, had Plaintiff Garces and Illinois Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

303.    Plaintiff Garces and Illinois Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that the

products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

304.    Acting as reasonable consumers, Plaintiff Garces and Illinois Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Garces and Illinois Subclass members first purchasing Defendant's baby food products.

305.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Garces and members of the Illinois Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

**COUNT 10**
**(On Behalf of Plaintiff Tarlton and the Indiana Subclass)**
**Violation of the Indiana Deceptive Trade Practices Act, Ind. Code § 24-5-0.5, *et seq*.**

306.    Plaintiff Tarlton repeats paragraphs 1–173 as if fully set forth herein.

307.    Indiana law prohibits suppliers from committing any "unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." Ind. Code § 24-5-0.5-3(a).

308.    As alleged herein, Defendant engaged in the following deceptive acts: representing that a subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have; representing that the subject of a consumer transaction is of a particular standard,

60

quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not; and representing that the consumer will be able to purchase the subject of the consumer transaction as advertised by the supplier, if the supplier does not intend to sell it. Ind. Code § 24-5-0.5-3(b)(1), (2), (11).

309.     Defendant's sales of its baby food products to Plaintiff and Indiana Subclass members constitute consumer transactions under Ind. Code § 24-5-0.5-2(1).

310.     Defendant is a supplier of its baby food products under Ind. Code § 24-5-0.5-2(3).

311.     Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

312.     Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of its baby food products to Plaintiff Tarlton and the Indiana Subclass.

313.     Defendant's aforementioned misrepresentations, omissions, and concealment are abusive and unfair because they offend public policy and/or cause substantial injury to consumers.

314.     Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Indiana Code §§ 16-42-2-2, 16-42-2-3.

315.     Defendant intended that Plaintiff Tarlton and Indiana Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing its baby food products. Defendant's unlawful acts are incurable deceptive acts under Ind. Code § 24-5-0.5-2(8).

316.    Plaintiff Tarlton and Indiana Subclass members reasonably relied on Defendant's respective misrepresentations, omissions, and concealment when they purchased its baby food products.

317.    Acting as reasonable consumers, had Plaintiff Tarlton and Indiana Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

318.    Plaintiff Tarlton and Indiana Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

319.    Acting as reasonable consumers, Plaintiff Tarlton and Indiana Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Tarlton and Indiana Subclass members first purchasing Defendant's baby food products.

320.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Tarlton and Indiana Subclass members suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals. Plaintiff Tarlton and Indiana Subclass members therefore seek

actual damages and $500, whichever is greater, treble or enhanced damages up to $1,000 for Defendant's willful and deceptive acts, and reasonable attorney fees, and costs.

**COUNT 11**
**(On Behalf of Plaintiffs Spurgeon, Walton, and the Iowa Subclass)**
**Violation of the Iowa Private Right of Action for Consumer Frauds Act,**
**Iowa Code §§ 714H.1, *et seq*. ("IPRACFA")**

321.     Plaintiffs Spurgeon and Walton repeat paragraphs 1–173 as if fully set forth herein.

322.     Iowa provides a right of action for consumer frauds. Iowa Code §§ 714H.1, *et seq*.

323.     Iowa prohibits unfair practices, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact. Iowa Code §§ 714H.3(1).

324.     Defendant's baby food products fall within IPRACFA because it is a consumer merchandise, and Plaintiffs Spurgeon and Walton and Iowa Subclass members are consumers within the meaning of IPRACFA. Iowa Code §§ 714H.2(3), (4).

325.     Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

326.     Defendant's respective misrepresentations, omissions, and concealment regarding its baby food products constitutes unfair, abusive, and deceptive acts or practices prohibited by the IPRACFA.

327.     Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

328.     Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and

63

distribution of Defendant's baby food products to Plaintiffs Spurgeon, Walton, and the Iowa Subclass.

329.     Defendant's aforementioned misrepresentations, omissions, and concealment are unfair and abusive because they offend public policy and cause substantial injury to consumers.

330.     Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Iowa Code § 190.3.

331.     Defendant intended that Plaintiffs Spurgeon, Walton, and the Iowa Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material facts in purchasing Defendant's baby food products.

332.     Plaintiffs Spurgeon, Walton, and Iowa Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

333.     Acting as reasonable consumers, had Plaintiffs Spurgeon, Walton, and Iowa Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

334.     Plaintiffs Spurgeon, Walton, and Iowa Subclass members suffered injuries in fact— *i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

335.     Acting as reasonable consumers, Plaintiffs Spurgeon, Walton, and Iowa Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food

requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiffs Spurgeon, Walton, and Iowa Subclass members first purchasing Defendant's baby food products.

336.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiffs Spurgeon, Walton, and members of the Iowa Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

**COUNT 12**
**(On Behalf of Plaintiff Lyles and the Maryland Subclass)**
**Violation of the Maryland Consumer Protection Act,**
**Md. Code, Comm. Law §§ 13-301, *et seq*. ("MCPA")**

337.    Plaintiff Lyles repeats paragraphs 1–173 as if fully set forth herein.

338.    The Maryland Consumer Protection Act, Md. Code, Comm. Law §§ 13-303, prohibits unfair, abusive, and deceptive practices, including: false, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers; representations that consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have; consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not; and a failure to state a material fact if the failure deceives or tends to deceive. Md. Code, Comm. Law §§ 13-301(1), (2)(i), (2)(iv), (3).

339.    The MCPA applies to Defendant's acts or practices as described herein because Defendant's acts or practices were in connection with the sale of consumer goods.

340.    Plaintiff Lyles and each member of the Maryland Subclass are persons within the meaning of Md. Code, Comm. Law § 13-408.

341.    Defendant's baby food products fall within MCPA because they are consumer goods.

342.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

343.    Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute unfair, abusive, and deceptive acts or practices prohibited by the MCPA.

344.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

345.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Lyles and the Maryland Subclass.

346.    Defendant's aforementioned misrepresentations, omissions, and concealment are unfair and abusive because they offend public policy and cause substantial injury to consumers.

347.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Md. Code, Health-Gen. Code §§ 21-207, 21-208, 21-210, 21-247.

348.    Defendant intended that Plaintiff Lyles and Maryland Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material facts in purchasing Defendant's baby food products.

349.    Plaintiff Lyles and Maryland Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

350.    Acting as reasonable consumers, had Plaintiff Lyles and Maryland Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

351.    Plaintiff Lyles and Maryland Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

352.    Acting as reasonable consumers, Plaintiff Lyles and Maryland Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Lyles and Maryland Subclass members first purchasing Defendant's baby food products.

353.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Lyles and members of the Maryland Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food

had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

**<u>COUNT 13</u>**
**(On Behalf of Plaintiff Santos and the Massachusetts Subclass)**
**Violation of the Massachusetts Regulation of**
**Business Practices for Consumers Protection Act**
**M.G.L.A. c. 93A, *et seq.***

354.     Plaintiff Santos repeats paragraphs 1–173 as if fully set forth herein.

355.     The Massachusetts Regulation of Business Practices for Consumers Protection Act, Mass. Gen. Laws c. 93A, et seq. ("MCPA"), provides protection to consumers by mandating fair competition in commercial markets for goods and services.

356.     The MCPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws c. 93A, § 2.

357.     The MCPA applies to Defendant's acts or practices as described herein because Defendant's acts or practices occurred in the conduct of trade or commerce. Mass. Gen. Laws c. 93A, § 1(b).

358.     Plaintiff Santos and each member of the Massachusetts Subclass are "persons," as defined by Mass. Gen. Laws c. 93A, § 1(a).

359.     Defendant's baby food products fall within the MCPA because they are a tangible goods sold in trade or commerce. Mass. Gen. Laws c. 93A, § 1(b).

360.     Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the misrepresentation that its brand of baby food were safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

68

361.     Defendant's   misrepresentations,   omissions,   and   concealment   regarding Defendant's  baby  food  products  constitute  deceptive  and  unconscionable  acts  or  practices prohibited by the MCPA.

362.     Defendant's  aforementioned  misrepresentations,  omissions,  and  concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

363.     Defendant's aforementioned misrepresentations, omissions, and concealment were used  or  employed  in  the  conduct  of  trade  or  commerce,  namely,  the  marketing,  sale,  and distribution of Defendant's baby food products to Plaintiff Santos and the Massachusetts Subclass.

364.     Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and cause substantial injury to consumers.

365.     Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Mass. Gen. Laws c. 94, §§ 186–187.

366.     Defendant intended that Plaintiff Santos and Massachusetts Subclass members rely on  their  respective  aforementioned  false  statements,  misrepresentations,  omissions,  and concealment of material facts in purchasing Defendant's baby food products.

367.     Plaintiff  Santos  and  Massachusetts  Subclass  members  reasonably  relied  on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

368.     Acting as reasonable consumers, had Plaintiff Santos and Massachusetts Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

369.     Plaintiff Santos and Massachusetts Subclass members suffered injuries in fact— *i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that

these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

370.    Acting as reasonable consumers, Plaintiff Santos and Massachusetts Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Santos and Massachusetts Subclass members first purchasing Defendant's baby food products.

371.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Santos and members of the Massachusetts Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

372.    All conditions precedent have occurred or been performed, including the sending of a proper demand letter.

### COUNT 14
**(On Behalf of Plaintiff Milton and the Michigan Subclass)**
**Violation of the Michigan Consumer Protection Act,**
**Mich. Comp. Laws § 445.901 ("MCPA"), *et seq*.**

373.    Plaintiff Milton repeats paragraphs 1–173 as if fully set forth herein.

374.    The Michigan Consumer Protection Act prohibits any unfair, unconscionable, or deceptive method, act, or practice in the conduct of trade or commerce. Mich. Comp. Law. § 445.903.

70

375. Defendant engaged in the following proscribed practices under section 445.903 of the MCPA: representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that goods or services are of a particular standard, quality, or grade, or that foods are of a particular style or model, if they are of another; advertising or representing goods or services with intent not to dispose of those goods or services as advertised or represented; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; and failing to reveal facts that are material to the transaction in light or representations of fact made in a positive manner. Mich. Comp. Law § 445.903(1)(c), (e), (h), (s), (cc).

376. The MCPA applies to Defendant's acts or practices as described herein because Defendant's acts or practices occurred in the conduct of trade or commerce. Mich. Comp. Law § 445.902(g).

377. Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food were safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

378. Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute deceptive and unconscionable acts or practices prohibited by the MCPA.

379. Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

380.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Milton and the Michigan Subclass.

381.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

382.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Mich. Comp. Law §§ 289.1105(1)(a), 289.1109(p).

383.    Defendant intended that Plaintiff Milton and Michigan Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

384.    Plaintiff Milton and Michigan Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

385.    Acting as reasonable consumers, had Plaintiff Milton and Michigan Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

386.    Plaintiff Milton and Michigan Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

387.    Acting as reasonable consumers, Plaintiff Milton and Michigan Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products

because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Milton and Michigan Subclass members first purchasing Defendant's baby food products.

388.    As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Milton and members of the Michigan Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

389.    Plaintiff Milton and the Michigan Subclass seek actual damages, statutory and punitive damages for Defendant's persistent and knowing violations, injunctive and declaratory relief, as well as reasonable attorneys' fees and costs under Mich. Comp. Law § 445.911.

## COUNT 15
### (On Behalf of Plaintiffs Musto, Nalley, and the Missouri Subclass)
### Violation of the Missouri Merchandising Practices Act ("MMPA"),
### Mo. Stat. § 407.010, *et seq.*

390.    Plaintiffs Musto and Nalley repeat paragraphs 1–173 as if fully set forth herein.

391.    The MMPA, Mo. Stat. § 407.010, *et seq.*, provides protection to consumers by mandating fair competition in commercial markets for goods and services.

392.    The MMPA prohibits any "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Stat. § 407.020(1).

393.    The MMPA applies to Defendant's acts or practices as described herein because Defendant's acts or practices occurred in the conduct of trade or commerce. Mo. Stat. § 407.010(7).

394.    Plaintiffs Musto, Nalley, and each member of the Missouri Subclass are "persons," as defined by Mo. Stat. § 407.010(5).

395.    Defendant's baby food products fall within the MMPA because they are tangible goods sold in trade or commerce. Mo. Stat. § 407.010(7).

396.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

397.    Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitutes deceptive and unconscionable acts or practices prohibited by the MMPA.

398.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

399.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiffs Musto, Nalley, and the Missouri Subclass.

400.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

401.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Mo. Stat. § 196.075(1).

402. Defendant intended that Plaintiffs Musto, Nalley, and Missouri Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

403. Plaintiffs Musto, Nalley, and Missouri Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

404. Acting as reasonable consumers, had Plaintiffs Musto, Nalley, and Missouri Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

405. Plaintiffs Musto, Nalley, and Missouri Subclass members suffered injuries in fact— *i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

406. Acting as reasonable consumers, Plaintiffs Musto, Nalley, and Missouri Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiffs Musto, Nalley, and Missouri Subclass members first purchasing Defendant's baby food products.

407. As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiffs Musto, Nalley, and members of the Missouri Subclass suffered damages by

75

purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

## COUNT 16
### (On Behalf of Plaintiff Powell and the Montana Subclass)
### Violation of Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code § 30-14-101, *et seq.*

408.    Plaintiff Powell repeats paragraphs 1–173 as if fully set forth herein.

409.    Montana prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Mont. Code § 30-14-103.

410.    Plaintiff Powell and Montana Subclass members are consumers under Mont. Code § 30-14-102(1).

411.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the misrepresentation that its baby food was safe for human consumption and the omission that its baby food contained unsafe levels of Toxic Heavy Metals.

412.    Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute unfair and deceptive acts or practices prohibited by Montana law.

413.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

414.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Powell and the Montana Subclass. Mont. Code § 30-14-102(8).

76

415.    Defendant's aforementioned misrepresentations, omissions, and concealment are unfair because they offend public policy and/or cause substantial injury to consumers.

416.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Mont. Code §§ 50-31-202–50-31-203.

417.    Defendant intended that Plaintiff Powell and Montana Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

418.    Plaintiff Powell and Montana Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

419.    Acting as reasonable consumers, had Plaintiff Powell and Montana Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

420.    Plaintiff Powell and Montana Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

421.    Acting as reasonable consumers, Plaintiff Powell and Montana Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable

consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Powell and Montana Subclass members first purchasing Defendant's baby food products.

422.   As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiff Powell and members of the Montana Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased this brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

**COUNT 17**
**(On Behalf of Plaintiffs Lau, Morrow, and the Nevada Subclass)**
**Violation of the Nevada Deceptive Trade Practices Act,**
**Nev. Rev. Stat. § 598.0915 ("NDTPA")**

423.   Plaintiffs Lau and Morrow repeat paragraphs 1–173 as if fully set forth herein.

424.   Nevada law prohibits knowingly making false representations as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods or services; representing that goods or services for sale are of a particular standard, quality, or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style, or model; and knowingly making false representations in a transaction. Nev. Rev. Stat. § 598.0915(5), (7), (15).

425.   Nevada provides that victims of unlawful acts under Nev. Rev. Stat. § 598.0915 *et seq*. are entitled to bring an action under Nev. Rev. Stat. § 41.600(1), (2).

426.   Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

427.    Defendant's respective misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute deceptive and unconscionable acts or practices prohibited by Nevada law.

428.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

429.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiffs Lau, Morrow, and the Nevada Subclass.

430.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

431.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Nev. Rev. Stat. §§ 585.300–585.350.

432.    Defendant intended that Plaintiffs Lau, Morrow, and Nevada Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

433.    Plaintiffs Lau, Morrow, and Nevada Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

434.    Acting as reasonable consumers, had Plaintiffs Lau, Morrow, and Nevada Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

435.     Plaintiffs Lau, Morrow, and Nevada Subclass members suffered injuries in fact—
*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that
these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy
Metals.

436.     Acting as reasonable consumers, Plaintiffs Lau, Morrow, and Nevada Subclass
members could not have avoided the injuries suffered by purchasing Defendant's baby food
products because they did not have any reason to suspect that its brand of baby food contained
elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food
requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a
reasonable consumer would make into the issue, and, in any event, such testing was not possible
without Plaintiffs Lau, Morrow, and Nevada Subclass members first purchasing Defendant's baby
food products.

437.     As a direct and proximate result of Defendant's deceptive and unconscionable acts
or practices, Plaintiffs Lau, Morrow, and members of the Nevada Subclass suffered damages by
purchasing Defendant's baby food products because they would not have purchased its brand of
baby food had they known the truth, and they received a product that was worthless because it
contains unsafe levels of Toxic Heavy Metals.

### COUNT 18
**(On Behalf of Plaintiff Hall and the New Hampshire Subclass)**
**Violation of New Hampshire Regulation of Business Practices for Consumer Protection,**
**N.H. Rev. Stat. §§ 358-A:1, *et seq*.**

438.     Plaintiff Hall repeats paragraphs 1–173 as if fully set forth herein.

439.     New Hampshire law prohibits unfair methods of competition and unfair or
deceptive acts or practices in the conduct of any trade or commerce, including but not limited to:
representing that foods or services have sponsorship, approval, characteristics, ingredients, uses,

benefits, or quantities that they do not have, representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model if they are of another, and advertising goods or services with intent not to sell them as advertised. N.H. Rev. Stat. §§ 358-A:2(V), (VII), (IX).

440.   New Hampshire Regulation of Business Practices for Consumer Protection applies to Defendant's acts or practices as described herein because Defendant's acts or practices occurred in the conduct of trade or commerce. N.H. Rev. Stat. § 358-A:1(II).

441.   Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

442.   Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute deceptive and unconscionable acts or practices prohibited by the New Hampshire Regulation of Business Practices for Consumer Protection.

443.   Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

444.   Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Hall and New Hampshire Subclass members.

445.   Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

446.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and N.H. Rev. Stat. § 146:1, *et seq*.

447.    Defendant intended that Plaintiff Hall and New Hampshire Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

448.    Plaintiff Hall and New Hampshire Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

449.    Acting as reasonable consumers, had Plaintiff Hall and New Hampshire Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

450.    Plaintiff Hall and New Hampshire Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

451.    Acting as reasonable consumers, Plaintiff Hall and New Hampshire Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Hall and New Hampshire Subclass members first purchasing Defendant's baby food products.

452.   As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Hall and members of the New Hampshire Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

## COUNT 19
**(On Behalf of Plaintiff Ashbourne and the New Jersey Subclass)**
**Violation of the New Jersey Consumer Fraud Act ("NJCFA"),**
**N.J. Stat. § 56:8, *et seq*.**

453.   Plaintiff Ashbourne repeats paragraphs 1–173 as if fully set forth herein.

454.   The New Jersey Consumer Fraud Act makes it unlawful for any person to act, use, or employ any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentations, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise. N.J. Stat. § 56:8-2.

455.   Plaintiff Ashbourne and the New Jersey Subclass members are consumers under the NJCFA, and Defendant are persons under the NJCFA who advertised and sold Defendant's baby food products in consumer transactions in New Jersey.

456.   Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

457.   Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute deceptive and unconscionable acts or practices prohibited by the New Jersey Consumer Fraud Act.

458. Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

459. Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Ashbourne and the New Jersey Subclass.

460. Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and cause substantial injury to consumers.

461. Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and N.J. Stat. §§ 24:5-1, 24:5-8, 24:5-17.

462. Defendant intended that Plaintiff Ashbourne and New Jersey Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

463. Plaintiff Ashbourne and New Jersey Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

464. Acting as reasonable consumers, had Plaintiff Ashbourne and New Jersey Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

465. Plaintiff Ashbourne and New Jersey Subclass members suffered injuries in fact— *i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

466.     Acting as reasonable consumers, Plaintiff Ashbourne and New Jersey Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Ashbourne and New Jersey Subclass members first purchasing Defendant's baby food products.

467.     As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Ashbourne and members of the New Jersey Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

### COUNT 20
**(On Behalf of Plaintiff Martin and the New York Subclass)**
**Violation of New York Deceptive Trade Practices Act, N.Y. Gen. Bus. Law § 349**

468.     Plaintiff Martin repeats paragraphs 1–173 as if fully set forth herein.

469.     New York General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349(a).

470.     Defendant engaged in deceptive acts and practices in the conduct of its business, trade and in commerce within the meaning of N.Y. Gen. Bus. Law § 349.

471.     Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the

misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

472.    Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute deceptive and unconscionable acts or practices prohibited by New York Gen. Bus. Law § 349.

473.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

474.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Martin and the New York Subclass.

475.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and cause substantial injury to consumers.

476.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and N.Y. Ag & Markets Law § 200.

477.    Defendant intended that Plaintiff Martin and New York Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

478.    Plaintiff Martin and New York Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

479.    Acting as reasonable consumers, had Plaintiff Martin and New York Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

480.     Plaintiff Martin and New York Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

481.     Acting as reasonable consumers, Plaintiff Martin and New York Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that this brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Martin and New York Subclass members first purchasing Defendant's baby food products.

482.     As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff Martin and members of the New York Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased this brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

### COUNT 21
**(On Behalf of Plaintiff Martin and the New York Subclass)**
**Violation of New York General Business Law § 350**

483.     Plaintiff Martin repeats paragraphs 1–173 as if fully set forth herein.

484.     New York law prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. Law § 350.

485.    Defendant's labeling, promotional material, and advertisements constitute false advertising under N.Y. Gen. Bus. Law § 350-a, which is defined as "advertising, including label, of a commodity...if such advertising is misleading in a material respect." N.Y. Gen. Bus. Law § 350-a. Included within the definition of false advertising are "not only representations made by statement, word, design, device, sound or any combination thereof," but also failures to "reveal facts material in the light of such representations with respect to the commodity." *Id*.

486.    Defendant's aforementioned misrepresentations, omissions, and concealment constitute false advertising within the meaning of N.Y. Gen. Bus. Law §§ 350, 350-a.

487.    Defendant's aforementioned conduct is deceptive and unlawful.

488.    Defendant intended that Plaintiff Martin and New York Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

489.    Plaintiff Martin and New York Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

490.    Acting as reasonable consumers, had Plaintiff Martin and New York Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

491.    Plaintiff Martin and New York Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

492.    Acting as reasonable consumers, Plaintiff Martin and New York Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that this brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Martin and New York Subclass members first purchasing Defendant's baby food products.

493.    As a direct and proximate result of Defendant's deceptive acts and practices and false advertising, Plaintiff Martin and members of the New York Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased this brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

### COUNT 22
**(On Behalf of Plaintiffs Daniels, Mejia, Pough, and the North Carolina Subclass)**
**Violation of the North Carolina Unfair and Deceptive Trade Practices Act,**
**N.C. Gen. Stat. § 75-1.1, *et seq*. ("NCUDTPA")**

494.    Plaintiffs Daniels, Mejia, and Pough repeat paragraphs 1–173 as if fully set forth herein.

495.    N.C. Gen. Stat. § 75-1.1(a) states: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

496.    Defendant's sales of Defendant's baby food products occurred in and affected commerce.

497.    In violation of the NCUDTPA, Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the misrepresentations that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

498.    Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute unfair and deceptive acts or practices.

499.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

500.    Defendant's acts and practices in connection with the sale of Defendant's baby food products were unfair because they took advantage of the inability of Plaintiffs Daniels, Mejia, Pough, and North Carolina Subclass members reasonably to protect their interests in ascertaining the Toxic Heavy Metal quantities of their products at the point of sale; Defendant knew that the price of their products (which are worthless given the excessive levels of Toxic Heavy Metals) were substantially in excess of the price at which they lawfully could be sold; and Defendant knew at the time of the transaction that Plaintiffs Daniels, Mejia, Pough, and the North Carolina Subclass members were unable to receive a substantial benefit from their products.

501.    Defendant intended that Plaintiffs Daniels, Mejia, Pough, and North Carolina Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

502.    Plaintiffs Daniels, Mejia, Pough, and North Carolina Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they Defendant's baby food products.

503.    Acting as reasonable consumers, had Plaintiffs Daniels, Mejia, Pough, and North Carolina Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

504.    Plaintiffs Daniels, Mejia, Pough, and North Carolina Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

505.    Acting as reasonable consumers, Plaintiffs Daniels, Mejia, Pough, and North Carolina Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiffs Daniels, Mejia, Pough, and North Carolina Subclass members first purchasing Defendant's baby food products.

506.    As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiffs Daniels, Mejia, Pough, and members of the North Carolina Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

**COUNT 23**
**(On Behalf of Plaintiff Altuve and the North Dakota Subclass)**
**Violation of the North Dakota Unlawful Sales or Advertising Practices,**
**N.D.C.C. § 51-15, *et seq*.**

507.    Plaintiff Altuve repeats paragraphs 1–173 as if fully set forth herein.

508.     The North Dakota Unlawful Sales or Advertising Practices ("North Dakota Act"), N.D.C.C. § 51-15, *et seq.*, provides protection to consumers by mandating fair competition in commercial markets for goods and services.

509.     The North Dakota Act prohibits any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby. N.D.C.C. § 51-15-02.

510.     The North Dakota Act further prohibits the act, use, or employment by any person of any act or practice, in connection with the sale or advertisement of any merchandise, which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition, and such an act is declared to be an unlawful practice. N.D.C.C. § 51-15-02.

511.     The North Dakota Act applies to Defendant's acts as described herein because it applies to any claim for relief by any person against any person who has acquired any moneys or property by means of any practice declared to be unlawful in this chapter. N.D.C.C. § 51-15-09.

512.     Defendant is a "person," as defined by N.D.C.C. § 51-15-01.

513.     Plaintiff Altuve and each member of the North Dakota Subclass are "persons," as defined by N.D.C.C. § 51-15-01.

514.     Defendant's baby food products are "merchandise," as defined by N.D.C.C. § 51-15-01(3).

515.     Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the

misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

516. Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute deceptive and unconscionable acts or practices prohibited by the North Dakota Act.

517. Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

518. Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Altuve and the North Dakota Subclass.

519. Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

520. Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and N.D.C.C. § 19-02.1-02.

521. Defendant intended that Plaintiff Altuve and North Dakota Subclass members rely on their respective aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

522. Plaintiff Altuve and North Dakota Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

523. Acting as reasonable consumers, had Plaintiff Altuve and North Dakota Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

524.     Plaintiff Altuve and North Dakota Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

525.     Acting as reasonable consumers, Plaintiff Altuve and North Dakota Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Altuve and North Dakota Subclass members first purchasing Defendant's baby food products.

526.     As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Altuve and members of the North Dakota Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased those brands of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

**COUNT 24**
**(On Behalf of Plaintiff Vice and the Ohio Subclass)**
**Violation of Ohio Consumer Sales Practices Act,**
**Ohio Rev. Code § 1345, *et seq*. ("OCSPA")**

527.     Plaintiff Vice repeats paragraphs 1–173 as if fully set forth herein.

528.     Plaintiff Vice is a consumer under section 1345.01(D) of the OCSPA.

529.    Defendant is a person and supplier who sold Defendant's baby food products to Plaintiff Vice and the Ohio Subclass in consumer transactions under sections 134501(A)–(C) of the OCSPA.

530.    Section 1345.02 of the OCSPA makes it unlawful for any supplier, such as Defendant, to commit an unfair or deceptive act of practice in connection with a consumer transaction, including without limitation: representing that the subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that it does not have (§ 1345.02(B)(1)); or representing that that the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not (§1345.02(B)(2)).

531.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

532.    Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute unfair and deceptive acts or practices.

533.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

534.    Section 1345.03 of the OCSPA makes it unlawful for any supplier, such as Defendant, to commit an unconscionable act or practice in connection with a consumer transaction. Ohio Rev. Code § 1345.03(A).

535.    Defendant's acts and practices in connection with the sale of Defendant's baby food products were unconscionable because they took advantage of the inability of Plaintiff Vice and Ohio Subclass members reasonably to protect their interests in ascertaining the Toxic Heavy Metal

quantities of their products at the point of sale; Defendant knew that the price of its products (which are worthless given the excessive levels of Toxic Heavy Metals) were substantially in excess of the price at which they lawfully could be sold; and Defendant knew at the time of the transaction that Plaintiff Vice and the Ohio Subclass members were unable to receive a substantial benefit from its products.

536.   Defendant intended that Plaintiff Vice and Ohio Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

537.   Plaintiff Vice and Ohio Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

538.   Acting as reasonable consumers, had Plaintiff Vice and Ohio Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

539.   Plaintiff Vice and Ohio Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

540.   Acting as reasonable consumers, Plaintiff Vice and Ohio Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that this brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer

would make into the issue, and, in any event, such testing was not possible without Plaintiff and Ohio Subclass members first purchasing Defendant's baby food products.

541.    As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Vice and members of the Ohio Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased that brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

**COUNT 25**
**(On Behalf of Plaintiff Weiss and the Pennsylvania Subclass)**
**Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law,**
**73 P.S. §§ 201-1, *et seq*. ("PUTPCPL)**

542.    Plaintiff Weiss repeats paragraphs 1–173 as if fully set forth herein.

543.    Plaintiff Weiss is a consumer under section 201-2(2) of the PUTPCPL.

544.    Defendant is a person who sold Defendant's baby food products to Plaintiff Weiss and the Pennsylvania Subclass in trade and commerce under sections 201-2(2)–(3) of the PUTPCPL.

545.    Section 201-3 of the PUTPCPL makes it unlawful to commit unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, including the following acts set forth in subsection 201-2(4) of the PUTPCPL: representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another; advertising goods with intent not sell them as advertised; and engaging in fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

546.     Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

547.     Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute unfair and deceptive acts or practices.

548.     Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

549.     Defendant's acts and practices in connection with the sale of Defendant's baby food products was unfair because it took advantage of the inability of Plaintiff Weiss and Pennsylvania Subclass members reasonably to protect their interests in ascertaining the Toxic Heavy Metal quantities of their products at the point of sale; Defendant knew that the price of its products (which are worthless given the excessive levels of Toxic Heavy Metals) were substantially in excess of the price at which they lawfully could be sold; and Defendant knew at the time of the transaction that Plaintiff Weiss and the Pennsylvania Subclass members were unable to receive a substantial benefit from their products.

550.     Defendant intended that Plaintiff Weiss and Pennsylvania Subclass members rely on their aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

551.     Plaintiff Weiss and Pennsylvania Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

552.    Acting as reasonable consumers, had Plaintiff Weiss and Pennsylvania Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

553.    Plaintiff Weiss and Pennsylvania Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

554.    Acting as reasonable consumers, Plaintiff Weiss and Pennsylvania Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Weiss and Pennsylvania Subclass members first purchasing Defendant's baby food products.

555.    As a direct and proximate result of Defendant's unfair methods of competition and unfair or deceptive acts or practices, Plaintiff Weiss and Pennsylvania Subclass members suffered ascertainable loss of money and property by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

556.    Pursuant to 73 P.S. § 201-9.2, Plaintiff Weiss and Pennsylvania Subclass members seek actual damages or at least $100, treble damages, costs and reasonable attorney fees, and such additional relief as the Court deems proper.

## COUNT 26
### (On Behalf of Plaintiff Kovacs and the Tennessee Subclass)
### Violation of the Tennessee Consumer Protection Act ("TCPA"),
### Tenn. Stat. § 47-18-101, *et seq*.

557.     Plaintiff Kovacs repeats paragraphs 1–173 as if fully set forth herein.

558.     The Tennessee Consumer Protection Act, Tenn. Stat. § 47-18-101, *et seq*., protects consumers from unfair and deceptive practices and acts.

559.     Plaintiff Kovacs is a consumer under Tenn. Stat. § 47-18-103(3).

560.     Defendant's baby food products are goods, and Defendant is a person who sold its products to Plaintiff Kovacs and Tennessee Subclass members in consumer transactions as those terms are defined under Tenn. Stat. § 47-18-103(8), (14), (20).

561.     Tenn. Stat. § 47-18-104(b)(5), (7), and (9) declare the following acts or practices unlawful:

    a.    Representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;

    b.    Representing that goods are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another; and

    c.    Advertising goods with intent not to sell them as advertised.

562.     Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

563.     Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute deceptive and unconscionable acts or practices prohibited by the TCPA.

564.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

565.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Kovacs and the Tennessee Subclass.

566.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

567.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Tenn. Stat. § 53-1-103.

568.    Defendant intended that Plaintiff Kovacs and Tennessee Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

569.    Plaintiff Kovacs and Tennessee Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

570.    Acting as reasonable consumers, had Plaintiff Kovacs and Tennessee Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

571.    Plaintiff Kovacs and Tennessee Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

572.    Acting as reasonable consumers, Plaintiff Kovacs and Tennessee Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that those brands of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Kovacs and the Tennessee Subclass members first purchasing Defendant's baby food products.

573.    As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Kovacs and members of the Tennessee Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

<u>**COUNT 27**</u>
**(On Behalf of Plaintiffs Campion, Wilson, and the Texas Subclass)**
**Violation of the Texas Deceptive Trade Practices-Consumer Protection Act,**
**V.T.C.A., Bus. & Comm. Code § 17.41, *et seq.***

574.    Plaintiffs Campion and Wilson repeat paragraphs 1–173 as if fully set forth herein.

575.    The Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Comm. Code § 17.41, *et seq.* ("DTPA"), provides protection to consumers by mandating fair competition in commercial markets for goods and services.

576.    The DTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Comm. Code § 17.46.

577.    The DTPA applies to Defendant's acts or practices as described herein because Defendant's acts or practices occurred in the conduct of trade or commerce. Tex. Bus. & Comm. Code § 17.46.

578.    Plaintiffs Campion, Wilson, and each member of the Texas Subclass are "consumers," as defined by Tex. Bus. & Comm. Code § 17.45(4).

579.    Defendant's baby food products fall within DTPA because they are "tangible chattels" purchased for use. Tex. Bus. & Comm. Code § 17.45(1).

580.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

581.    Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute deceptive and unconscionable acts or practices prohibited by the DTPA.

582.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

583.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiffs Campion, Wilson, and the Texas Subclass members.

584.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

585. Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Tex. Health & Safety Code Ann. § 431.082 (Misbranded Food).

586. Defendant intended that Plaintiffs Campion, Wilson, and Texas Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

587. Plaintiffs Campion, Wilson, and Texas Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

588. Acting as reasonable consumers, had Plaintiffs Campion, Wilson, and Texas Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

589. Plaintiffs Campion, Wilson, and Texas Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

590. Acting as reasonable consumers, Plaintiffs Campion, Wilson, and Texas Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible

without Plaintiffs Campion, Wilson, and Texas Subclass members first purchasing Defendant's baby food products.

591.    As a direct and proximate result of Defendant's false, misleading, and deceptive acts and practices, Plaintiffs Campion, Wilson, and members of the Texas Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

## COUNT 28
### (On Behalf of Plaintiff Okolo and the Virginia Subclass)
### Violation of the Virginia Consumer Protection Act of 1977 ("VCPA"),
### Va. Code § 59.1-196, *et seq*.

592.    Plaintiff Okolo repeats paragraphs 1–173 as if fully set forth herein.

593.    The Virginia Consumer Protection Act of 1977, Va. Code § 59.1-200, proclaims that the following are fraudulent acts or practices and are unlawful: misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; advertising or offering for sale goods that are used, secondhand, repossessed, defective, blemished, deteriorated, or reconditioned, or that are "seconds," irregulars, imperfects, or "not first class," without clearly and unequivocally indicating in the advertisement or offer for sale that the goods are as such; using deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction. Va. Code § 59.1-200(A)(5), (6), (7), (14).

594.    Plaintiff Okolo and each member of the Virginia Subclass are consumers under the VCPA.

595.    Defendant's baby food products are "goods" under the VCPA that were sold to Plaintiff Okolo and the Virginia Subclass members in consumer transactions.

596.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that it brand of baby food contained unsafe levels of Toxic Heavy Metals.

597.    Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute unfair and deceptive acts prohibited under the VCPA.

598.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

599.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Okolo and Virginia Subclass members.

600.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

601.    Defendant intended that Plaintiff Okolo and Virginia Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

602.    Plaintiff Okolo and Virginia Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

603.    Acting as reasonable consumers, had Plaintiff Okolo and Virginia Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

604.    Plaintiff Okolo and Virginia Subclass members suffered loss and injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

605.    Acting as reasonable consumers, Plaintiff Okolo and Virginia Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Okolo and Virginia Subclass members first purchasing Defendant's baby food products.

606.    As a direct and proximate result of Defendant's deceptive acts or practices, Plaintiff Okolo and Virginia Subclass members suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

607.    Under Va. Code § 59.1-204(A), (B), Plaintiff Okolo and Virginia Subclass members seek actual damages, or $500, whichever is greater, and treble their actual damages, or $1,000 for Defendant's willful violations of the VCPA. In addition, Plaintiff Okolo and Virginia Subclass members seek reasonable attorneys' fees and costs. Plaintiff Okolo and Virginia Subclass members also seek to enjoin Defendant from further violating the VCPA under Va. Code § 59.1-205.

**COUNT 29**
**(On Behalf of Plaintiff Anderson and the Washington Subclass)**
**Violation of the Washington Consumer Protect Act ("WCPA"),**
**RCWA § 19.86.010, *et seq*.**

608.     Plaintiff Anderson repeats paragraphs 1–173 as if fully set forth herein.

609.     RCWA § 19.86.020, declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce to be unlawful.

610.     Plaintiff Anderson and each member of the Washington Subclass are persons who are consumers. RCWA § 19.86.010(1).

611.     Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

612.     Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute unfair and deceptive acts prohibited under the WCPA.

613.     Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

614.     Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Anderson and Washington Subclass members.

615.     Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

616.     Defendant intended that Plaintiff Anderson and Washington Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

617.     Plaintiff Anderson and Washington Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

618.     Acting as reasonable consumers, had Plaintiff Anderson and Washington Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products they would have declined to purchase these products.

619.     Plaintiff Anderson and Washington Subclass members suffered loss and injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

620.     Acting as reasonable consumers, Plaintiff Anderson and Washington Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that this brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Anderson and Washington Subclass members first purchasing Defendant's baby food products.

621.     Defendant's unfair or deceptive acts or practices alleged herein are injurious to the public interest because they violate statutes, including statutes containing specific legislative

declaration of public interest impact, such as the Washington Food, Drugs, and Cosmetics Act (RWCA §§ 69.04.001, 69.04.016, 69.04.040), and because Defendant's unlawful acts or practices injured and will continue to injure other persons, and it has (and had) the capacity to injure others. RCWA § 19.86.093.

622. As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Anderson and Washington Subclass members suffered damages by purchasing Defendant's baby food products because they would not have purchased that brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

623. Plaintiff Anderson and Washington Subclass members seek to enjoin Defendant's further violations of the law, and recover actual damages they have sustained, costs of suit, and a reasonable attorney's fee. Plaintiff Anderson and the Washington Subclass also seek treble damages pursuant to RCWA § 19.86.085.

**COUNT 30**
**(On Behalf of Plaintiff Gillens and the Washington D.C. Subclass)**
**Violation of Consumer Protection Procedures Act,**
**D.C. Code § 28-3901, *et seq*. ("CPPA")**

624. Plaintiff Gillens repeats paragraphs 1–173 as if fully set forth herein.

625. The CPPA states that it is unfair and deceptive to represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another; misrepresent as to a material fact which has a tendency to mislead; fail to state a material fact if such failure tends to mislead. D.C. Code §§ 28-3904(a), (d), (e), (f).

110

626.    Plaintiff Gillens and each member of the Washington D.C. Subclass are consumers. D.C. Code § 28-3901(2).

627.    Defendant's baby food products fall within the CPPA because they meet the definition of "goods and services." D.C. Code § 28-3901(7).

628.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food were safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

629.    Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute unfair and deceptive acts prohibited under the CPPA.

630.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

631.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Gillens and the Washington D.C. Subclass.

632.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

633.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act.

634.    Defendant intended that Plaintiff Gillens and Washington D.C. Subclass members rely on their respective aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

635.    Plaintiff Gillens and Washington D.C. Subclass members reasonably relied on Defendant's respective misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

636.    Acting as reasonable consumers, had Plaintiff Gillens and Washington D.C. Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

637.    Plaintiff Gillens and Washington D.C. Subclass members suffered injuries in fact— *i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

638.    Acting as reasonable consumers, Plaintiff Gillens and Washington D.C. Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that those brands of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Gillens and Washington D.C. Subclass members first purchasing Defendant's baby food products.

639.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Gillens and members of the Washington D.C. Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

**COUNT 31**
**(On Behalf of Plaintiff Conner and the West Virginia Subclass)**
**West Virginia Consumer Credit and Protection Act,**
**W. Va. Code § 46A-6-101, *et seq*. ("WVCPPA")**

640.    Plaintiff Conner repeats paragraphs 1–173 as if fully set forth herein.

641.    The West Virginia Consumer Credit and Protection Act ("WVCCPA"), W.Va. Code, § 46A-6-104, declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful.

642.    Defendant's conduct described above constituted the following prohibited acts: representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that goods are of a particular standard, quality or grade, or that goods are of a particular style or model if they are of another; advertising goods with intent not to sell them as advertised, using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of material facts with intent that others rely upon such. W. Va. Code § 46A-6-101(E), (G), (I), (L), (M).

643.    Plaintiff Conner and each member of the West Virginia Subclass are consumers. W. Va. Code § 46A-6-101(2).

644.    Defendant's sales of Defendant's baby food products are within the WVCCPA because Defendant's labels and promotional material are advertisements in trade or commerce and resulted in sales to consumers, including Plaintiff Conner and the West Virginia Subclass members. W. Va. Code § 46A-6-101(1), (2), (5), (6).

645.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food were safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

113

646. Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute unfair and deceptive acts prohibited under the WVCPPA.

647. Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

648. Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Conner and the West Virginia Subclass.

649. Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the FDCA.

650. Defendant intended that Plaintiff Conner and West Virginia Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

651. Plaintiff Conner and West Virginia Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

652. Acting as reasonable consumers, had Plaintiff Conner and West Virginia Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would not have purchased these products.

653. Plaintiff Conner and West Virginia Subclass members suffered injuries in fact and ascertainable loss—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

654.     Acting as reasonable consumers, Plaintiff Conner and West Virginia Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Conner and West Virginia Subclass members first purchasing Defendant's baby food products.

655.     As a direct and proximate result of Defendant's unlawful acts or practices, Plaintiff Conner and members of the West Virginia Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals. Plaintiff Conner, individually and on behalf of the West Virginia Subclass, seeks actual damages, or $200 for each violation, enhanced damages, equitable relief, including declaratory and injunctive relief, reasonable attorney's fees, and costs.

656.     All conditions precedent have occurred or been performed, including the sending of a proper demand letter.

## COUNT 32
**(on Behalf of Plaintiff Prondzinski and the Wisconsin Subclass)**
**Violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.183**

657.     Plaintiff Prondzinski repeats paragraphs 1–173 as if fully set forth herein.

658.     Pursuant to Wisconsin Stat. § 100.183(1):

No person, firm, corporation or association shall, with intent to sell, or increase the consumption thereof, or create an interest therein, make, publish, disseminate, circulate, or place before the public in this state, or cause, directly or indirectly to be made, published, disseminated, or placed

before the public in this state, in a newspaper or other publication, or in the form of a book notice, handbill, poster, bill, circular or pamphlet, or in any other manner, an advertisement of any sort regarding articles of food, which advertisement contains any assertion, representation or statement which is untrue, deceptive or misleading.

659.    In addition, Wis. Stat. § 100.183(2) provides:

It shall be unlawful to advertise any dairy or other food product which is of a grade or quality inferior to or less valuable than the usual and ordinary grade established by common understanding or law for such product, or from which a more valuable portion has been removed, without plainly and conspicuously stating that the article advertised is below and inferior to the usual and ordinary grade.

660.    Defendant's aforementioned misrepresentations, omissions, and concealment are untrue, deceptive and misleading, in violation of Wis. Stat. §§ 100.183(1)–(2).

661.    Defendant's baby food products contained assertions, representations and statements which are untrue, deceptive, and misleading in representing food as suitable for consumption by infants and children.

662.    As a result of Defendant's use of ingredients with excessive levels of one or more Toxic Heavy Metals, Defendant's baby food products are inferior in quality and grade than the usual and ordinary grade established by common understanding for baby food products and foods directed to and intended for consumption by infants and developing children.

663.    Defendant failed plainly and conspicuously to disclose that Defendant's baby food products is below and inferior to the usual and ordinary grade.

664.    Defendant intended that Plaintiff Prondzinski and Wisconsin Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

665.    Plaintiff Prondzinski and Wisconsin Subclass members reasonably relied on Defendant's respective misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

666.    Acting as reasonable consumers, had Plaintiff Prondzinski and Wisconsin Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

667.    Plaintiff Prondzinski and Wisconsin Subclass members suffered injuries in fact— *i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

668.    Acting as reasonable consumers, Plaintiff Prondzinski and Wisconsin Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that this brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Prondzinski and Wisconsin Subclass members first purchasing Defendant's baby food products.

669.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Prondzinski and members of the Wisconsin Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased this brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

<u>COUNT 33</u>
**(On Behalf of All Plaintiffs and the Class and Each State Subclass)**
**Fraudulent Concealment**

670.    Plaintiffs repeat paragraphs 1–173 as if fully set forth herein.

671.    As alleged above, the presence of elevated levels of Toxic Heavy Metals in baby food is a material fact to consumers.

672.    Defendant knew that the presence of elevated levels of Toxic Heavy Metals in Defendant's baby food products was a material fact to consumers, such as Plaintiffs and members of the Class.

673.    Because Defendant is responsible for, and control, the manufacturing, marketing, distribution, and sale of Defendant's baby food products, Defendant knew and intended that its omissions and concealment of the presence of elevated levels of Toxic Heavy Metals in its brands of baby food would mislead Plaintiffs and Class members, and induce them to buy products that they would otherwise not have been willing to purchase.

674.    Acting as reasonable consumers, had Plaintiffs and Class members been aware of the true facts regarding Defendant's baby food products they would have declined to purchase those brands of baby food.

675.    Plaintiffs and Class members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

676.    Acting as reasonable consumers, Plaintiffs and Class members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized

scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiffs and Class members first purchasing Defendant's baby food products.

677.    As a direct and proximate result of Defendant's fraudulent concealment, Plaintiffs and members of the Class suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

### COUNT 34
**(On Behalf of All Plaintiffs and the Class and Each State Subclass)**
**Unjust Enrichment**

678.    Plaintiffs repeat paragraphs 1–173 as if fully set forth herein.

679.    Defendant knew that the presence of elevated levels of Toxic Heavy Metals in Defendant's baby food products was a material fact to consumers, including Plaintiffs and Class members.

680.    Because Defendant is responsible for, and control, the manufacturing, marketing, distribution, and sale of Defendant's baby food products, Defendant knew and intended that its omissions and concealment of the presence of elevated levels of Toxic Heavy Metals in its brands of baby food would mislead Plaintiffs and Class members, and induce them to buy products that they would otherwise not have been willing to purchase.

681.    Acting as reasonable consumers, had Plaintiffs and Class members been aware of the true facts regarding the Defendant's baby food products, they would have declined to purchase those brands of baby food.

682.    Acting as reasonable consumers, Plaintiffs and Class members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not

have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiffs and Class members first purchasing Defendant's baby food products.

683.    As a direct and proximate result of Defendant's misrepresentations and omissions, Plaintiffs and members of the Class conferred a benefit on Defendant—*i.e.*, the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

684.    Defendant acquired and retained money belonging to Plaintiffs and the Class as a result of their wrongful conduct—*i.e.*, misrepresenting that Defendant's baby food products were safe for human consumption, and concealing the fact that those brands of baby food contained unsafe levels of Toxic Heavy Metals. Defendant profited at the expense of Plaintiffs and Class members in connection with each individual sale of Defendant's baby food products because Plaintiffs and Class members paid money for products that were worthless due to the fact that they are not safe for human consumption.

685.    Defendant has unjustly received and retained a benefit at the expense of Plaintiffs and the Class because Defendant unlawfully acquired its profits for worthless (and unsafe) baby food products while appreciating and knowing that Defendant's baby food products were unsafe for human consumption, contrary to their misrepresentations and omissions.

686.    Defendant's retention of that benefit violates the fundamental principles of justice, equity, and good conscience because Defendant misled Plaintiffs and the Class into falsely

believing that Defendant's baby food products were safe and did not contain unsafe levels of Toxic

Heavy Metals in order to unjustly receive and retain a benefit.

687.     Under the principles of equity, Defendant should not be allowed to keep the money

rightfully belonging to Plaintiffs and the members of the Class because Defendant have unjustly

received it as a result of Defendant's unlawful actions described herein.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually, and on behalf of the Class and Subclasses, pray for

an Order as follows:

A.     Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Class and/or Subclasses defined herein;

B.     Designating Plaintiffs as representatives of the Class and/or the respective Subclasses, and designating undersigned counsel as Class Counsel;

C.     Entering judgment in favor of Plaintiffs and the Classes and/or Subclasses, and against Defendant;

D.     Awarding Plaintiffs and Class and/or Subclass members all relief to which they are entitled, including awards for their actual damages, statutory damages, treble damages, enhanced damages, and punitive damages for Defendant's willful and intentional conduct;

E.     Ordering equitable relief, including restitution, disgorgement of any of Defendant's ill-gotten gains, imposing a constructive trust in favor of Plaintiffs and the Class and/or Subclass members, and awarding those amounts to Plaintiff and the Class and/or Subclass members;

F.     Granting injunctive relief, including but not limited to, an order: (1) requiring Defendant to cease its unlawful and deceptive practices; (2) requiring Defendant to implement and maintain adequate manufacturing procedures, final product testing procedures, and ingredient sourcing and inspection practices to ensure their baby food does not contain unsafe and unacceptable levels of Toxic Heavy Metals; and (3) requiring clear and prominent disclosure requirements on Defendant's product packaging regarding the levels of Toxic Heavy Metals in their finished products;

G.     Awarding Plaintiff and the Class and/or Subclass attorneys' fees and costs, including interest thereon, as allowed or required by law; and

H.   Granting all such further and other relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all counts so triable.

Dated:  August 6, 2021                    Respectfully submitted,

By: /s/ *Francis J. Balint, Jr.*
Francis J. Balint, Jr.
*fbalint@bffb.com*
**BONNETT FAIRBOURN FRIEDMAN & BALINT PC**
Joshua Gunnell House, Suite 4
4023 Chain Bridge Road
Fairfax, VA 22030
Telephone: (602) 776-5903
Fax: (602) 274-1199

Patricia N. Syverson
(*pro hac vice* anticipated)
*psyverson@bffb.com*
**BONNETT FAIRBOURN FRIEDMAN & BALINT PC**
9655 Granite Ridge Drive, Ste. 200
San Diego, CA  92123
Telephone: (619) 79804593
Fax: (602) 274-1199

Thomas A. Zimmerman, Jr.
(*pro hac vice* anticipated)
*tom@attorneyzim.com*
Sharon A. Harris
(*pro hac vice* anticipated)
*sharon@attorneyzim.com*
Matthew C. De Re
(*pro hac vice* anticipated)
*matt@attorneyzim.com*
Jeffrey D. Blake
(*pro hac vice* anticipated)
*jeff@attorneyzim.com*
**ZIMMERMAN LAW OFFICES, P.C**.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602

122

(312) 440-0020 telephone
(312) 440-4180 facsimile
www.attorneyzim.com

Counsel for Plaintiffs and the putative Classes